LILLIAN DE LEON, Plaintiff, *v.* AETNA LIFE INSURANCE COMPANY OF HARTFORD et al., Defendants.

Municipal Court of the City of New York, Borough of Manhattan, March 31, 1949.

*Harris Jay Griston* for plaintiff.

*Daniel Miner* and *James F. Robertson* for Aetna Life Insurance Company of Hartford, defendant.

*Travers E. Devlin* for Hudson & Manhattan Railroad Company, defendant.

GENUNG, J. Plaintiff moves for an order to vacate a decision which directed a verdict for the defendants, and to order a new trial.

This is an action to recover $1,000 death benefits on two certificates of life insurance, each in the amount of $500, issued by the defendant, Hudson & Manhattan Railroad Company, to the plaintiff's (now deceased) husband, John Ponce De Leon (also known as Raymond Ponce De Leon), an employee of the railroad company (hereinafter called the Assured). Certificate No. 5177 was issued April 3, 1926, and No. 5177A on April 3, 1928. These two certificates of insurance were issued to the assured under the terms of a Master Group Policy No. 129, which the defendant railroad company carried with the defendant, Aetna Life Insurance Company of Hartford.

In the first cause of action, the plaintiff, who was named beneficiary in both certificates, sues both defendants on these two certificates for their face amount. In the second cause of action, the plaintiff sues the railroad company for damages in the face amount of these two certificates, for having wrongfully obtained the cancellation of the two certificates by the insurance company.

Both defendants interpose the defense that both certificates were cancelled on September 30, 1942, because of the decedent's termination of employment on September 15, 1942. In addition, both defendants allege, as separate defenses, that a third certificate issued to the decedent on November 24, 1943, No. 7822 for $500 has been paid after the Assured's death. The insurance company alleges this payment as a complete defense, that this constitutes a full discharge of all the obligations that the insurance company then owed under the master policy, in relation to that deceased employee. The railroad company alleges that this payment is a " partial affirmative defense ", apparently intending it to constitute a set-off of $500 against the plaintiff's claim of $1,000.

The case was tried before me and a jury on November 24, 1948, in the course of which trial, the jury was excused, after the parties had entered into the following stipulation on that record: " After consultation between the Court and counsel for the respective parties, it is stipulated that the jury be waived and

the case submitted to the Court at the termination of the trial as a question of law to be determined by the Court.''

The parties thereafter entered stipulations extending the court's time in which to render the decision. Within such stipulated time, the decision was rendered on January 17, 1949.

The motion for a new trial was timely and properly made.

Where a case is tried before a judge without a jury, the judgment entered upon his own decision may be set aside by him and a new trial ordered on any of the grounds which are mentioned in section 549 of the Civil Practice Act, for setting aside a judgment in a jury trial, and he may do so also '' in furtherance of justice, for any error in form or substance.'' (N. Y. City Mun. Ct. Code, § 6, subd. 7; § 129, subd. 3.) This is well settled. (*Bradstreet's C. Bureau* v. *Nagler's B. Works, Inc.* 95 Misc. 188 [App. Term, 1st Dept.], affd. 180 App. Div. 511.) This rule was expressly reaffirmed in *Morris* v. *Phillips* (48 N. Y. S. 2d 423) (App. Term, 1st Dept.). In the order setting aside the judgment the court '' must state his reasons therefor and be sustained by the record.'' (*Morris* v. *Phillips, supra.*) He must also set a date for the new trial. (*Murphy* v. *Joline,* 62 Misc. 461.) He has no power, after setting aside the judgment which was rendered in favor of one party, to grant a judgment to the opposite party, but must limit himself to ordering a new trial. (*Bradstreet* case, *supra.*) Of course, the trial judge, in a case tried with a jury, has the power to do likewise under subdivision 7 of section 6 and subdivision 3 of section 129 of the New York City Municipal Court Code. (*Prudential Paper Co.* v. *Ashland Press Inc.,* 231 App. Div. 515 [1st Dept.].)

The motion for a new trial '' must be made at the close of the trial or within twenty days after service of a copy of the judgment and notice of entry thereof ''. (N. Y. City Mun. Ct. Code, § 129, subd. 3.) Not the date of the judgment, but the date of entry of the judgment on the clerk's docket controls the time within which the motion under subdivision 3 of section 129 of the New York City Municipal Court Code may be made (*J. M. Etzel Co., Inc.,* v. *Fairchild Sons, Inc.,* 169 N. Y. S. 504 [App. Term, 1st Dept.]).

The motion for a new trial was brought on for hearing, by order to show cause, on February 15, 1949. No judgment had then yet been entered. So the motion was timely brought. Since then, the parties stipulated extensions of time in which to decide this motion. On the 10th day of March, 1949, while the motion was pending undecided, and within the stipulated period for making the decision, the defendants entered judgment with the

clerk. That was proper, for there was no stay, but it does not bar determination of the pending motion for a new trial. (*Arker* v. *Cohen,* 136 App. Div. 871.)

The basic issue in this case is whether the employee's employment had "terminated" on or prior to the 30th day of September, 1942 (when the two certificates were cancelled by the Insurer at the request of the railroad company), within the intent and meaning of the master group policy, so as to warrant the cancellation of the employee's insurance thereunder. Actually, both defendants claim that the employment was "terminated" on September 15, 1942.

The policy cancellation clause is contained in a rider dated November 18, 1946 (policy, p. 14) and provides that a right to cancel the certificates thereunder would arise "*Upon or at any* time *after termination* of employment upon written request therefor executed by the employer and filed at the Home Office of the Company. Said request shall bear the date employment *terminated* ". (Emphasis supplied).

The employee was "in charge of supplies in the Plaster Department." He was continuously in defendant's employ from April 3, 1925, to September 15, 1942. On that latter date, which was during the war period, the defendant ran short of materials and supplies for a short time. The Assured was "laid off" on that date " on account of scarcity of work." He was told it was only a temporary lay-off, until such time as materials and supplies arrived, and that as soon as the supplies did arrive, he would be put back to work. William A. Davis, superintendent of buildings of the railroad company directly under whom the assured worked, testified as follows:

" Q. Isn't it a fact at that time, there was a shortage of material? A. A shortage of work.

" Q. Because of an absence of material, you didn't employ your full staff? A. That's right.

" Q. And you told him at that time, that until you again have a sufficiency of supplies and materials, you would have to lay off part of your help? A. That's right.

" Q. And you told him you would notify him as soon as materials are available for resumption of work? A. Not in that way, but in effect."

He was not told to seek employment elsewhere. Nor was he told that he was discharged. " Q. Did you ever send him a notification in writing that he was discharged? A. No, I didn't send him any notice."

The contrary appears. He was told to report on " shape-up ", and to keep on reporting daily for work, to see if materials and supplies arrived, and that as soon as they did, he would be promptly put back to active work, and that is exactly what was done: " Q. You said you called him back on each of those occasions? A. Yes, and of course, he was on *shape-up,* so that he came down and if we had work, we put him to work. We couldn't tell whether there would be work any particular day until the day itself."

After his " lay-off " on September 15, 1942, he began reporting on " shape-up " to see if the materials and supplies had arrived, and shortly thereafter, on October 14, 1942, which was within 28 days, they did arrive, and he was put back to work for as long as the supplies lasted. He was again " laid off " on October 20, 1942, and put back on November 2, 1942. He was again " laid off " on November 17, 1942, but within a week was back at work on November 24, 1942. Now supplies were arriving regularly and he remained at work for about three years, until he suffered his fatal sickness, and was taken to the hospital where he died on February 12, 1946. This was 21 years after he first was employed by the defendant railroad company. All of this is established by documentary evidence taken from the records of defendant railroad company.

His work was described as " mason's helper " and later as " assistant mason's helper ", but it is conceded that at all times his work was the same: " Q. In fact, the nature and substance of the work he did *at all the time* he worked for you *from 1925 to the time of his death, was the same?* A. That is right."

It is also conceded that his work was at all times satisfactory: " Q. There is no question that his services were at all times satisfactory? A. No, sir."

On February 14, 1946, his employment card, which bore Badge No. 294, was closed by the railroad company, because the Assured was " deceased." His employment badge number had been 294 for many years, at least from August 27, 1937 to the date of his death on February 12, 1946.

These facts show that the Assured had only been temporarily " laid off " on September 15, 1942, and had never been " discharged ", so that his employment had never been " terminated."

This appears not only from the foregoing recital of the facts, but from the interpretation that the defendants themselves give as to the meaning of the words " employment terminated ", in relation to the policy and the certificates issued thereunder. A

printed form of cancellation request was prepared by the defendants which they used for that purpose, in relation to that policy and the certificate issued thereunder. That printed form contains, besides other information, two columns, designated A and B, respectively. The top of that printed form contains the following legend above the columns:

" If employment *terminated* use Column A only, giving actual date employee was *discharged* or *quit*. ·

" If employee *laid off*, show lay-off date in Column A and end of period for which coverage is desired in Column B." (Emphasis supplied).

It will be observed that employment is deemed " terminated " if the employee is " discharged " or if he " quit." If he was not " discharged ", and if he did not " quit ", but his work was suspended, he was only deemed to have been " laid off ".

In this manner, the defendants have themselves created a sharp distinction between " termination " and " lay-off ". As the policy itself says, that cancellation rights may be exercised " *upon* or at any time *after termination* of employment ", and as, by the defendant's own definition, no " termination of employment " took place here, the attempt to cancel the certificates was wrongful, not only as a matter of fact, but also as a matter of law.

The defendants' own interpretation of the words " termination of employment ", as distinguished from " lay-off ", as those terms were being used by them in relation to the policy and the certificates issued thereunder, is sufficient for the purposes of this case, to establish that no " termination of employment " took place. The defendants' own practical construction of a contract is controlling. (*Carthage T. P. Mills* v. *Vil. of Carthage,* 200 N. Y. 1; *City of New York* v. *New York City Ry. Co.,* 193 N. Y. 543, 548; *Dobbins* v. *Pratt Chuck Co.,* 242 N. Y. 106, 113, and cases there collated.)

It is interesting to note, however, that the defendants' own interpretation of those words conforms with the well-settled law on the subject.

In its Bulletin No. 686, " Union Agreement Provisions," the Bureau of Labor Statistics of the United States Department of Labor shows the distinction clearly. It captions chapter 16 (p. 125), " Lay-off and Reemployment ", while it captions chapter 18, " Dicharge and Quits ", to show the distinction that exists between the two. It then differentiates the two as follows: " Is ' discharge ' synonymous with ' lay-off '? Discharge is universally recognized as meaning to terminate employment,

whereas lay-off means to suspend or cause to cease work for a time. The courts have recognized that difference in these words as does the dictionary. See 24 Words and Phrases 447; Teller on Labor Disputes and Collective Bargaining, Vol. 2, Sec. 276, p. 753; *North Whittier Heights Citrus Association* v. *N. L. R. B.*, 309 U. S. 206. Arbitration Award by Dudley E. Whiting, *In re Dow Chemical Co.*, and *International Union, United Automobile Aircraft, Agricultural Implement Workers of America*, 17 Labor Relations Reporter 646.''

It has been repeatedly settled in National Labor Relations Board cases that '' lay-off '' is not a discharge, and does not constitute '' termination of employment.'' (*North Whittier Heights Citrus Assn.* v. *National Labor Relations Board*, 109 F. 2d 76; *National Labor Relations Board* v. *Waterman Steamship Corp.*, 309 U. S. 206, 218–220; *Fishgold* v. *Sullivan Corp.*, 328 U. S. 275.)

That the employment was *not* '' terminated '', in the case at bar so as to give the defendants a right to cancel the certificates and that the employer-employee relationship continued during the '' lay-off '' period, is settled not only by the foregoing authorities, but also by the defendants' own interpretation thereof in the legend on the printed cancellation request form, by the fact that the Assured was told that he was being '' laid off '' only because supplies had been exhausted, and that he would be put back to work as soon as supplies arrived, by the fact that he was told to report on '' shape-up '' daily during the period that he was '' laid off '', by the written records that he had only been '' laid off '', coupled with the fact that as soon as supplies did arrive, he was put back to work and kept at work until the time of his death, and did the same kind of work for 21 years.

As employment was not '' terminated '', no right arose to cancel the certificates of insurance.

A similar situation arose in the case of *Degnan* v. *Metropolitan Life Ins. Co.* (178 Misc. 312), wherein the Appellate Term, First Department, had occasion to interpret a cancellation clause in a similar policy, in relation to similar certificates, as to what constitutes '' termination '' of employment, and as to when the certificates may be cancelled, where the policy provides that they may be cancelled on and after '' termination '' of employment. In that case, the employee had gone out on strike. The employer orally requested the insurance company to cancel the certificate on the ground that the assured had '' quit '', and that, therefore, his employment had '' terminated ''. The insurance com-

pany had no knowledge of the fact that the employee was on strike, so relied on the employer's statement, and cancelled the certificate. The court there held that the mere fact that the employee went out on strike and stopped working did *not* terminate the employer-employee relationship, but that such relationship continued during the period of the strike, and that, therefore, there was no " termination " of employment. The court cited a number of National Labor Relations Board cases, which had so ruled, and adopted that rule as the law applicable to the facts in that case, even though the employer there differed with that interpretation and claimed that when the employee went out on strike, he quit, and thereby " terminated " his employment. The court there further held that, as the employment had not been " terminated " by the employee going on strike, the employer had no right to request the insurance company to effectuate a cancellation, and that, therefore, the employer was liable in damages for his wrongful act, and the court said (p. 313): " It follows, therefore, that the cancellation of the policy by the employer, because of the existence of the strike, was improper and that the employer was properly held liable by the court below."

And the dissenting opinion concurred on this (p. 314): " It therefore follows that by going out on strike the employee did not cease to be employed. The National Biscuit Company is clearly liable because by its action it destroyed the rights of the assured in the policy of insurance made for his benefit. It did so solely on the erroneous assumption that by going out on strike the assured severed his employment with the company."

A judgment against the employer for the face amount of the certificate was affirmed.

In the case at bar, not only do the National Labor Relations Board cases establish that employment did not terminate upon " lay-off ", but the defendants' own interpretation of the expression establishes this, as do also the facts in the case. There having been no " termination of employment," it follows, under the express authority of the *Degnan* case (*supra*), that the employer is liable in damages for the face amount of the certificates for having wrongfully requested the insurance company to cancel the certificates.

The insurance company, on the other hand, claims that the complaint should be dismissed as against it, because it acted at the request of the railroad company employer, who had a right to make requests for cancellation, under the terms of the policy,

citing the *Degnan* case. But the right of the railroad company to request cancellation of the certificates was a conditional right, expressly limited in the policy cancellation rider, as arising only " upon or at any time after termination of employment." The facts in the *Degnan* case, however, with regard to the insurance company, differed materially from the facts in the case at bar. In the *Degnan* case, the insurance company *never knew* that the employee had not quit, and that he had only gone out on strike. The burden was on the plaintiff (beneficiary) to show some evidence that the cancellation was effected by the insurance company wrongfully. In the absence of any proof that the insurance company had knowledge of the true facts, as was the situation in the *Degnan* case, it may well have relied in good faith on the employer's wrongful statement that the employee had quit, and his employment thereby terminated. In the case at bar, however, the insurance company knew, by the very information contained in writing on the railroad company's written cancellation request itself, that the employee had *not* been " discharged ", but that he had only been " laid off ", and that, therefore, no " termination of employment " had taken place. The date of the " *lay-off* " had been given in Column A, and the date on which the railroad company requested the insurance to be cancelled was given in Column B. The insurance company, therefore, knew that the employee had only been " laid off ", and that he had not been " discharged ", and his employment had not been " terminated." Under the express provisions of the policy, the cancellation right could be exercised only if employment had been " terminated." The insurance company, therefore, had no right to cancel the certificates, and the attempted cancellation thereof was invalid. (*Kolodyiej* v. *Metropolitan Life Ins. Co.*, 307 Ill. App. 657; *Janneck* v. *Metropolitan Life Ins. Co.*, 162 N. Y. 574.)

The insurance company makes the contention that the plaintiff beneficiary has no action against it, because the certificates were payable to the railroad company, and that, therefore, there is no privity between the plaintiff and the defendant. This contention is without merit. With regard to those certificates and the proceeds, the railroad company acts only as a trustee for the employee. By the policy, the insurance company agrees " to pay the amounts stated as the sum insured upon any card attached thereto bearing the stamped seal of the company, which cards form a part hereof ". It further provides, " any sum payable by the company as a death claim shall be payable to the beneficiary indicated as such in the application for this insur-

ance." The card as to this beneficiary (defendant insurance company's Exhibit F) refers to the railroad company's interest in regard to that employee's certificate, as follows:

" Hudson & Manhattan Railroad Company, Trustee." A rider to the policy, dated July 24, 1920 (page 10A) provides that no stamped seal would thereafter be required on those cards.

Policy rider, dated May 14, 1937 (Policy, p. 21) provides as follows: " That the amount payable under the policy applied for at the death of the insured (employee) shall be payable to the Hudson & Manhattan Railroad Company Trustee, the applicant for this insurance to be paid or used by said trustee for the benefit of such members of the family of the deceased and in an amount and in a manner that may be deemed by said trustee for the best interest of the family."

The rider goes on to explain that this provision was supplemented, prior to the date of the rider (i.e., May 14, 1937), with forms, whereby employees so insured would designate beneficiaries, who would be the persons to receive the death proceeds of such certificates. The rider refers thereto as follows:

" Whereas it was the intention and is the mutual understanding of the employer of the company that the provisions of the rider above referred to constituted the designees of the beneficiary to whom death benefits should be paid under said policy in respect of employees then or whenever insured thereunder, and said rider has been so construed and acted upon by the parties thereto since the date of issue of said policy."

The rider reconfirms those provisions and adds that " Nothing contained herein shall be held to alter or affect any of the terms and conditions of this policy other than as herein stated."

Beneficiary cards were made out by the employee as to both certificates, and in both of which he named his wife, the plaintiff as beneficiary. One of them dated July 27, 1926, relates to Certificate No. 5177 and while the beneficiary card for the second Certificate No. 5177A was not produced by defendant railroad company, it is conceded by the attorney for the railroad company that the employee made out a similar beneficiary card as to Certificate No. 5177A.

These documents establish that while the insurance company was to pay the death proceeds of an employee to the railroad company, it was paid to it only as trustee for the employees and their beneficiaries, and it was required, by the terms of the policy, to pay those death proceeds to the beneficiary of the particular employee as designated on the beneficiary card furnished by the employee. The insurance company having failed to

pay the railroad company the proceeds of these two certificates, the beneficiary for whose benefit the two certificates were issued may sue the insurance company directly, as the real party in interest. That is well-settled law. (*Lewis* v. *Home Insurance Co.*, 199 App. Div. 556 [1st Dept.]; *Exton & Co., Inc.* v. *Home Fire & Marine Insurance Co.*, 222 App. Div. 237 [1st Dept.], affd. 249 N. Y. 259, 262.)

The insurance company alleges as a complete defense that on November 24, 1943, it issued to the employee, Certificate A-7822 for $500 which certificate it paid after the employee's death. The railroad company alleges it as a partial defense. Apparently, the railroad company intends it to be considered as a $500 set-off to plaintiff's cause of action for $1,000, whereas the insurance company intends it to be considered as payment of plaintiff's claim by some theory of substitution of rights of the old certificate under the new certificate. But, if this is their intention it is not alleged. Nor is it material.

Defendants call attention to the fact that on the front bottom page of the third certificate No. A-7822, for $500, issued November 24, 1943, outside of the printed margin, appears this printed notation: "This Certificate replaces any and all insurance certificates and riders that may have been issued previously to the above named employee under any and all group policies of life insurance issued by the Aetna Life Insurance Company."

This notation purports to infer that an agreement to that effect was made on or prior to November 24, 1943. But there is no proof that such an agreement was ever made. The contrary appears. The employee's benficiary card for the policy has no such agreement. The railroad company admits it did not even discuss this certificate with him before it was obtained from the insurer. The insurer concedes it never had any dealings directly with the employee. The railroad company's own written application request for this third certificate is barren of any such agreement. The mere notation on the policy, referring to such nonexisting agreement, does not create such an agreement, but is a nullity. (*Blatz* v. *Travelers Ins. Co.*, 272 App. Div. 9.)

Even if the notation be deemed to be a term of the third certificate, it is there by the wrongful act of the insurer. There is no reference to such a provision in either the railroad company's application for the policy or in the assured's beneficiary card. The insurer is duty-bound to issue a policy in conformity with the application therefor, and not to insert any additional or different terms. The insurer may not rely on its own wrongful

act, the additional term inserted in the certificate (if it could be deemed a provision) without authority, as a defense to the insurance, or to defeat rights thereunder, and it is estopped from relying thereon. (*Ellis* v. *Columbian Nat. Life Ins. Co.*, 270 App. Div. 143, affd. 296 N. Y. 594; *International Ferry Co.* v. *American Fidelity Co.*, 207 N. Y. 350; *Davern* v. *American M. L. Ins. Co.*, 241 N. Y. 318, 326–327; *Hay* v. *Star Fire Ins. Co.*, 77 N. Y. 235, 240; *Lewitt & Co., Inc.*, v. *Jewelers Safety F. Soc.*, 249 N. Y. 217, 222.)

Nor did the third certificate have any connection with the cancellation of the two certificates referred to in the complaint.

The certificates referred to in the complaint were cancelled on September 30, 1942. As the employment had not been " terminated " at or prior to that date, the attempted cancellation of those two certificates was invalid, and they must be paid.

The third certificate was issued on November 24, 1943. It appears that under policy paragraph 6, the railroad company had a right to request issuance of $500 insurance, as a discretionary grant to the employee, in addition to $1,000 insurance to which the employee was entitled as a matter of right, under policy paragraphs 5 and 8 and policy rider of August 31, 1916, for a total of $1,500. A policy will be construed so as to give effect to each provision therein (*Kratzenstein* v. *Western Assurance Co.*, 116 N. Y. 54, quoted and followed in *Birnbaum* v. *Jamestown Mut. Ins. Co.*, 298 N. Y. 305), and to be most favorable and to grant the greatest coverage to the beneficiary (*Parry* v. *Maryland Casualty Co.*, 135 Misc. 883, affd. 228 App. Div. 393; *Birnbaum* case, *supra*.).

But even if the policy did not provide for granting an employee $1,500 of insurance, but only $1,000, it would not aid defendant here. The third certificate was voluntarily applied for by the railroad company to the insurer in writing. The payment thereof was voluntarily made by the insurance company to the railroad company as trustee, who voluntarily paid the proceeds to the beneficiary named on the beneficiary card for that third certificate — the plaintiff herein. She was required to execute an affidavit that this $500 payment was for that third certificate. The check had attached to it a memorandum separated by a perforated line, that this check was given in payment of that third certificate. No reference is in the check memorandum, check, or affidavit, that this $500 payment relates in any way to the two certificates which are the subject of plaintiff's cause of action. If defendants intend to claim that this third certificate was either issued, or paid, through some error, fraud

or mistake, that would require them to bring an action for affirmative equitable relief, which cannot be done in the Municipal Court. (*Geller* v. *Kings County Mortgage Co.*, 97 Misc. 708, [App. Term, 2nd Dept.].) It is no bar in this action to the right of the plaintiff, beneficiary, to recover the sum of $1,000 due her on the two certificates of insurance, which are the subject of the complaint's cause of action.

The motion to set aside the direction of the verdict for the defendants is granted, the judgment entered thereon is vacated, and the case is set down on the calendar of April 11, 1949, for trial.