NATIONAL LABOR RELATIONS BOARD *v.* WATERMAN STEAMSHIP CORP.

No. 193.  Argued January 3, 1940.—Decided February 12, 1940.

Mr. *Robert B. Watts,* with whom *Solicitor General Jackson* and Messrs. *Thomas Harris, Wilber Stammler, Charles Fahy, Laurence A. Knapp,* and *Mortimer B. Wolf* were on the brief, for petitioner.

Messrs. *Gessner T. McCorvey* and *C. A. L. Johnstone, Jr.* for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The court below, upon petition of respondent to set aside an order of the Labor Board, decided that the Board's order was not supported by substantial evidence, said the order was based on mere suspicion, and declined

208

to enforce it. Whether the court properly reached that conclusion is the single question here.

We do not ordinarily grant certiorari to review judgments based solely on questions of fact. In its petition, however, the Board earnestly contended that the record before the Court of Appeals had presented "clear and overwhelming proof" that the Waterman Steamship Company had been guilty of a most flagrant mass discrimination against its employees in violation of the National Labor Relations Act, and that the court had unwarrantedly interfered with the exclusive jurisdiction granted the Board by Congress. The Board's petition also charged that the present was one of a series of decisions in which the court below had failed "to give effect to the provision of the Act that the findings of the Board as to facts, if supported by evidence, shall be conclusive." [1]

In that Act, Congress provided, "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." [2] It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has

---

[1] The Board specifically referred to *National Labor Relations Board v. Bell Oil & Gas Co.*, 98 F. 2d 406, rehearing denied 98 F. 2d 870 (also, 91 F. 2d 509; 98 F. 2d 405; 99 F. 2d 56); *Peninsular & Occidental S. S. Co.* v. *National Labor Relations Board*, 98 F. 2d 411, certiorari denied, 305 U. S. 653; *Globe Cotton Mills* v. *National Labor Relations Board*, 103 F. 2d 91.

[2] 49 Stat. 449, § 10 (e).

deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that, courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act. And therefore charges by public agencies constitutionally created—such as the Board—that their duly conferred jurisdiction has been invaded so that their statutory duties cannot be effectively fulfilled, raise questions of high importance. For this reason we granted certiorari.[3]

Respondent, Waterman Steamship Company, of Mobile, Alabama, is engaged in maritime transportation between this country, Europe, and the West Indies. Upon complaint made by the National Maritime Union, a labor organization affiliated with the Committee for Industrial Organization, the Board held hearings and found that respondent had, at Mobile, laid up the ships "Bienville" (27 days) and "Fairland" (7 days) for dry-docking and repairs, and had, in violation of the National Labor Relations Act:

(a) discharged and refused to reinstate, because of membership in the N. M. U., the entire unlicensed crew and the chief steward, Edmund J. Pelletier, of the Steamship "Bienville," and all but three of the crew of the Steamship "Fairland";

(b) discharged and refused to reinstate C. J. O'Connor, second assistant engineer of the "Azalea City" because of his activities in representing aggrieved members of the Marine Engineers Beneficial Association, a labor organization of licensed ship personnel affiliated with the C. I. O.;

(c) and, pending an election directed by the Board to permit the ships' crews to select their bargaining agencies,

---

[3] 308 U. S. 534. Cf. *Federal Communications Commission* v. *Pottsville Broadcasting Co., ante,* p. 134.

had interfered with its employees' free right to select a union of their own choosing under § 7 of the Act by refusing to grant ships' passes to representatives of the C. I. O. affiliate, while at the same time issuing passes to representatives of the International Seamen's Union affiliated with the American Federation of Labor.[4]

The Board's order in question was based on the foregoing findings.

A clear understanding of the issues presented by the mass discharge of the crews of the "Bienville" and the "Fairland" necessitates initial reference to the federal laws governing engagement of seamen for foreign voyages. There is provision, 46 U. S. C. 564, that a master of any vessel bound from the United States to foreign ports (with exceptions not pertinent) "shall, before he proceeds on such voyage, make an agreement, in writing or in print, with every seaman whom he carries to sea as one of the crew . . ." This written agreement, commonly referred to in maritime circles as articles, must specify the nature and duration of the intended voyage or engagement; the port or country at which the voyage will terminate; the number and description of the crew and their employments; the time each seaman must be on board to begin work and the capacity in which he is to serve; wages; provisions to be furnished each seaman; regulations to which the seaman will be subjected on board such as fines, short allowance of provisions or other

---

[4] In outline, the Board ordered the Waterman Company to cease and desist from issuing ships' passes to the A. F. of L. on a favored basis as compared to the C. I. O.; from discouraging membership in C. I. O. affiliates by discriminating against its members; and from interfering with its employees' rights of self-organization and free collective bargaining. It affirmatively ordered the Company to grant equal passes to the C. I. O. and the A. F. of L., if granted to either; to make whole and offer full reinstatement to those employees found to have suffered discrimination; and to post appropriate notices on the Waterman vessels.

lawful punishments for misconduct; and stipulations of any advance and allotment of the seaman's wages. And the provisions of 46 U. S. C. 567–8 impose penalties for carrying seamen in ships' crews on foreign voyages without entering into the required articles. All seamen "discharged in the United States from merchant vessels engaged in voyages . . . to any foreign port . . . shall be discharged and receive their wages in the presence of a duly authorized shipping commissioner . . ." *Id.* 641. The master and each seaman shall "in the presence of the shipping commissioner, . . . sign a mutual release of all claims for wages *in respect of the past voyage or engagement";* the release must be recorded in a book which shall be kept by the commissioner, and such release "shall operate as a mutual discharge. and settlement of all demands for wages between the parties . . ., on account of wages, in respect of the *past voyage or engagement." Id.,* 644. (Italics supplied.)

Respondent, the Waterman Company, has taken the position that when the crews of the "Bienville" and "Fairland" received their wages and signed off statutory articles in Mobile, all tenure of employment and employment relationship of these men were at an end. From this premise, the Company insists that vacancies were created as the men signed off and, under an outstanding contract with the I. S. U., preference in filling these vacancies had to be given to members of the I. S. U. unless contractual obligations were to be violated.[5] How-

---

[5] In part, that contract reads: "Section 1. It is understood and agreed that as vacancies occur, members of the International Seamen's Union of America, who are citizens of the United States; shall be given preference of employment, if they can satisfactorily qualify to fill the respective positions; provided, however, that this Section shall not be construed to require the discharge of any employee who may not desire to join the Union, or to apply to prompt reshipment, or absence due to illness or accident." Only the discharge of Pelletier is claimed by the Company to have been due to incompetency. The

ever, the Board contends that the signing off of articles when the ship's voyage ended at Mobile served only to end employment "in respect of the past voyage or. engagement" and, therefore, it proceeded to examine the evidence to determine whether there was, after completion of the voyages in question of the "Bienville"' and "Fairland," a continuing relationship, tenure, term or condition of employment between the Company and its men. The Act provides [6] that

"It shall be an unfair labor practice for an employer— To interfere with . . . [the employees' right of self-organization].

.        .        .        .        .

"By discrimination in regard to hire or tenure of employment or any term or condition ,of employment to encourage or discourage membership in any labor organization:'  . . ."

The protection to seamen embodied in the federal statutes which have been referred to has existed in some form since the earliest days of the Nation.[7] This statutory plan was never intended to forbid the parties from mutually undertaking to assure a crew the right to continue as employees and to re-sign if it desires after signing off articles at a voyage's end. The design was to protect seamen from being carried to sea against their will; to prevent mistreatment as to wages and to assure against harsh application of the iron law of the sea during voyages.[8] The Board, therefore, properly heard evi-

Court below held that O'Connor had taken a vacation and was not discharged, and was thus entitled to vacation pay and reinstatement; the Board had ordered that O'Connor be made whole "for any loss of .pay" suffered as a result of the Company's acts which the Board found had been discriminatory.

[6] 49 Stat. 449, 452, §§ 7, 8.

[7] See 1 Stat. 131.

[8] See *Lent Traffic Co. v. Gould*, 2 F. 2d 554, 556; *United States* v. *Westwood*, 266 F. 696, 697; *The Occidental* (D. C.), 101 F. 997. As

dence as to whether the crews of the "Bienville" and "Fairland" had, unless discharged for cause, a continuing tenure or relationship entitling them to re-sign when the temporary lay-ups of their ships ended. If, as the Board found, there were such continuing tenure and customary term or condition of employment, of course no vacancies occurred when the men of the "Bienville" and the "Fairland" signed off articles in Mobile. And respondent's contract with the I. S. U., which only provided preferential treatment of the I. S. U. (A. F. of L.) in filling vacancies, did not require the Company to discharge the N. M. U. (C. I. O.) men from these ships.

If, therefore, there was substantial support in the evidence for the findings that these crews had a continuing right to and customary tenure, term or condition of employment within the purview of the Act even though their ships were temporarily laid up, and that this relationship was terminated by the Company because of the crews' C. I. O. affiliation, the court below was required to enforce the Board's order.

*Evidence as to the continuing tenure, and conditions and relation of employment.* On the basis of nine to ten years at sea, one witness testified that a ship's crew is customarily kept on when she goes into dry dock and is laid up for temporary repairs; and that both the Waterman Company and the unions had observed that custom. Another, with a background of ten years experience at sea, in visiting some fifty ships in dry dock at Mobile during the preceding few months had learned of forty-nine which had not laid off their entire crews but had kept a substantial number of their crews working aboard ships; the fiftieth had laid off its entire crew after going into dry dock, but "the company kept the jobs open." He knew

to the history of this legislation, see *United States* v. *The Brig Grace Lathrop*, 95 U. S. 527.

of one vessel that had remained "in dry dock for a period of forty-five days and maintained its crew during that period," several which had done so recently for thirty-day periods, and many for periods "from five to ten days, fifteen days." He had himself been a member of a crew maintained in its entirety while his ship was in dry dock for twenty-two days.

An oiler and deck engineer, with eight years in the service, had been on a Waterman ship which, as recently as 1936, spent six days in repairs, keeping its crew on; and had "known them to stay on fifteen or twenty days and continue working that long." Asked what obligation an employer owes a sailor after the latter returns from a foreign voyage, completes his contract under the ship's articles, is paid off and discharged before a Shipping Commissioner, he answered "If my services are satisfactory and my work efficient, I have the right to stay on that ship, if I have not done anything to be discharged for. Why shouldn't I make another trip? . . . Q. Is it true to state that a seaman's job is still existent, although he may not be drawing pay while the boat is tied up for repairs? A. Yes, sir. Q. There is no vacancy in his job? A. No; there is no vacancy."

The chief steward of the "Bienville," employed by Waterman since 1934 and a seaman since 1918, testified that crews of ships in dry dock—tied up for repairs for a few days—"have to do their work and get paid for it by the Waterman Steamship Corporation" and unless they quit or are fired "for cause" there is no vacancy. The giving of a discharge according to the ship's articles, he understood "to be a termination of the voyage, but not a termination of the employment."

Although at sea but three years, a fireman and oiler testified that he had been re-signed, upon the termination of articles, after each of fourteen trips on a single ship, from Southern ports including Mobile, had been kept as

a member of a crew on a ship in for repairs nine days and had "known of one ship that was laid up [for lack of cargo] for five weeks and the crew went back."

A marine fireman, oiler and watertender, at sea since 1922, had been on a Waterman ship in for repairs ten or twelve days, the crew of which was retained only in part, but those laid off "were notified when the ship went into commission they can go out again." He "was on one [ship] that stayed two months in dry dock . . . just part of the crew . . . [were kept on, but] the whole crew was there for their jobs when she was commissioned again." He had never heard of a mass discharge of an entire crew such as occurred on the "Bienville" and "Fairland." In part, the testimony of this former I. S. U. member was: "Q. Do the unions consider that there is no vacancy until a man resigns? A. Yes; they do not figure it is any vacancy until they call the [Union] Hall for another man."

A seaman in the employ of the Waterman Company intermittently since 1924, had been on a Waterman boat which kept its whole crew during six or seven days in dry dock. It had been his experience that a crew was kept on ships in dry dock or being repaired, unless a ship was to be laid up indefinitely, i. e., for two or three months, in which event only a skeleton crew would be maintained. But, he added, the Waterman Company itself follows the custom of "calling back to the ship" men who have been laid off indefinitely and "are still around," and men standing idly by without pay at the end of a voyage still regard themselves in the employ of the shipowner.

One witness had served as a fireman on a Waterman ship that spent the period between the first of November and Thanksgiving of 1932 in dry dock and undergoing repairs; she kept "approximately all of" her crew aboard ship working during this period; a few were permitted to go home in the interim, but returned when she started

her voyage. On another occasion, he testified, the same Waterman boat stayed in dry dock about sixty days, retaining approximately the entire crew; although after five days in dry dock he was called out of town to appear as a witness, he later got his job back. In his capacity as a shipyard worker in which he was employed at Mobile at the time of this hearing, this same witness observed "we have boats coming in from twenty-five up to thirty days . . . and the crew works in there, and they may want to lay off part of the crew, or work a major part, or maybe they will be discharged, but those that want to go back, their jobs is open if they wish them." Of some six hundred ships he had seen or worked on in dry dock or being repaired, he had seen but one complete discharge of an entire crew, but even that crew were told they could come back "if they wanted their jobs." According to his understanding and that of seamen as he knew it, articles were "protection to the seamen by the United States Government for a certain voyage, and to a certain port, or your final port of discharge or first loading port. That is a termination of the articles to the seaman, but not the end of the employment."

A witness who had worked for the Waterman Company since 1929, who had been a marine engineer for fourteen years, and at sea twenty years, testified that a crew which is laid off is customarily re-employed when a ship emerges from dry dock, unless laid off "for cause." A Waterman ship, on which he had been at the time serving, laid up in Mobile from December, 1936, to about January 25, 1937, "and the engineers were kept on her, and to the best of my knowledge the firemen and watertenders and oilers were kept on there."

The executive vice-president of the Waterman Company recalled that recently the crew of only one other vessel going in for repairs had been discharged, and that this particular crew also had been affiliated with the

N. M. U. (C. I. O.). Of the several Waterman vessels which he mentioned as having been put up in Mobile for dry-docking or repairs during the previous year, he could note only the one that had not kept its entire crew (other than the "Bienville" and "Fairland"); the one other crew that was discharged en masse, he admitted, was the one other also affiliated with the C. I. O.

The witness who had been captain of the "Fairland" when she went into dry dock, had served the Waterman Company continuously since 1924, with the exception of one year, in capacities ranging from ordinary seaman to ship's master. Yet, in all his experience with the Company, he had never heard of a ship in dry dock that had laid off her entire crew. And Waterman's port captain, a veteran of twenty-four years, had taken perhaps a half dozen of Waterman ships into dry dock, never staying more than twenty-four hours in dry dock but with a total of eight to ten days in port, and his crews were never laid off; he preferred to retain a crew for a succeeding voyage.

In the very contract which the Waterman Company made with the I. S. U. there are terms providing that "IN HOME PORT, all men may be required to work eight (8) hours daily . . . [with provision for overtime]." And the section of the contract covering preference for I. S. U. men "shall not be construed to require the discharge of any employee who may not desire to join the [I. S. U.] . . ." That the contract contemplated an employment independent of the articles and subject to termination in a manner other than by the mere expiration of articles, is apparent from the provision that "Nothing in this agreement shall prevent . . . [the Company] from discharging any member of the crew who is not satisfactory to the Company."

All the evidence on this issue which the Board had before it has, of course, not been set out. In summary, it

is glaringly apparent that men who had in various capacities followed the sea in the aggregate for roughly a hundred years, offered testimony that a seaman's tenure and relationship to his ship and employer are not terminated by the mere expiration of articles when his ship lays up in dry dock or for repairs, and that the Waterman Company—and maritime people generally—have recognized and followed this custom. Even the Waterman Company's executive vice-president could cite only one instance in the Company's recent past in which this custom had been departed from, but that particular mass firing of the crew of a ship headed for a temporary lay-up was directed against the only C. I. O. crew, other than those of the "Bienville" and "Fairland," with which the Waterman Company apparently had been asked to deal. And the master of the "Fairland," with personal knowledge of the Company's practice reaching back to 1924, had never heard of "another case where the entire crew was laid off." .

In the words of the Act, an employer cannot terminate his employees' "tenure of employment or any term or condition of employment" [9] because of union activity or affiliation. These words are not limited so as to outlaw discrimination only where there is in existence a formal contract or relation of employment between employer and employee. They embrace, as well, all elements of the employment relationship which in fact customarily attend employment and with respect to which an employer's discrimination may as readily be the means of interfering with employees' right of self-organization as if these elements were precise terms of a written contract of employment. The Act, as has been said, recognizes the employer's right to terminate employment for

---

[9] § 8, (1), (3).

normal reasons.[10] No obstacle of legal principle barred the Board from finding that there was, even after the ships were temporarily laid up, a relationship of employment or tenure between the Waterman Company and its men. That there may be a tenure or term of employment determinable at will is a recognized principle of law.[11] For the purpose of the Act, it is immaterial that employment is at will and terminable at any time by either party.[12] A large part of all industrial employment is of this nature. For illustration, factory workers are customarily employed at will, without obligation of employer or employed to continue the relationship when the day's work is done; or, if there is an agreement fixing salary or wages per unit of service, at so much per day, week or month, there may be an indefinite employment terminable by either party at the end of any unit period. But when such employees are customarily continued in their employment with recognition of their preferential claims to their jobs, it cannot be doubted that their wholesale discharge at the end of the day or other unit period, in order to favor one union over another, would be discrimination in regard to the "tenure" or "condition" of their employment in violation of the Act. And employees under such tenure of employment as these seamen were, have a right guaranteed by the Act that they will not be dismissed because of affiliation with a particular union.

[10] *National Labor Relations Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, 45.

[11] See, e. g., *Alabama Mills* v. *Smith*, 237 Ala. 296; 186 So. 699; *Peacock* v. *Virginia-Carolina Chemical Co.*, 221 Ala. 680; 130 So. 411; *Great Atlantic & Pacific Tea Co.* v. *Summers*, 25 Ala. App. 404; 148 So. 332; cert. den., 226 Ala. 635; 148 So. 333. Cf. *U. S. Fidelity & Guaranty Co.* v. *Millonas*, 206 Ala. 147; 89 So. 732; 29 A. L. R. 520.

[12] Cf. *Morgan* v. *Commissioner*, *ante*, p. 78; *Lyeth* v. *Hoey*, 305 U. S. 188, 193.

Since the Board justifiably found that an employment relationship protected by the Act continued after the "Bienville" and "Fairland" were temporarily laid up, it becomes unnecessary to consider the additional finding of the Board that the "dates and duration of the particular lay-ups were arranged for the purpose of making it possible to discharge the crews because they had joined the N. M. U."

The sole question remaining is whether the evidence supported the findings of the Board that the employment or tenure of the crews and of O'Connor and Pelletier were terminated because they had joined or engaged in the activities of the C. I. O.

*Evidence of discrimination because of C. I. O. affiliation.* About July 1, 1937, the entire crew of the "Bienville" and all but three of the "Fairland," previously I. S. U. (A. F. of L.), joined the N. M. U. (C. I. O.) in Tampa, Florida. Such action had been decided on in June by the crew of the "Bienville" while she was in Le Havre, France After the crew of the "Bienville" changed to the C. I. O. at Tampa and before she reached Mobile, the A F. of L. representative at Tampa informed the A. F. of L. representative at Mobile, by telephone, that the change had taken place. And the Mobile A. F. of L. representative "at that time" notified the Waterman Company of the change. Intervening scheduled stops of the "Bienville" were cancelled by a memorandum purporting to have been written on July 1 and ordering her to Mobile to "go on inactive status for a period of about twenty days." The port captain of the Waterman Company, who signed this memorandum, stated that it was written on July 1, "to the best of . . . [his] knowledge." He added that it had not been written until after the "Bienville" was on her return voyage from Le Havre. That was after the ship's crew had, in assembly, determined to turn C. I. O. No such cancellation was directed to the

"Fairland." The "Fairland," he testified, was laid up because periodic repairs "were due." On the other hand, her master had no knowledge of any contemplated lay-up until she reached Mobile, and understood, according to advice given him, that she was laid up because "she was behind schedule . . . and they put her back to the next sailing." The Waterman port captain thought she was laid up because repairs "were due"; he had no knowledge that it was because she was behind schedule. Her master's testimony showed, "Q. The laying up plan, then, had been something that was contemplated in Tampa?

"No, Sir.

"Q. It was something that came into existence after you sailed from Tampa and before you came to Mobile, is that right?

"A. Yes."

The "Fairland" is equipped with radio.

The ships were in Mobile by July 6. There was testimony that a member of the crew of the "Bienville," on the sixth, was asked by the executive vice-president of the Company why the change of unions was made and was told by that official "a man has to use his own head." This same witness testified that several of the discharged crew were given some work ashore and that "on a Saturday afternoon we collected three days pay, they held back two days in the week, and about three o'clock in the afternoon the first assistant came around there and I was working on some safety valves on the boilers, and . . . .[the assistant port engineer of Waterman Company] said, 'Well, I got a chance to fire you at last,' and I said, 'What is that?' And he said, 'Well, you can get the rest of your money when you are finished,' and I said, 'What's the matter, aren't we going to sail the ship?' And he said, 'No, not unless you go back to the other place,' and I said, 'What other place?' And he said, 'The I. S. U.' "

Pelletier, the steward on the "Bienville" worked for Waterman from 1934 until discharged after joining the N. M. U. (C. I. O.). When the "Bienville" arrived at Mobile, Waterman's port steward went to the boat, and talked with the mate, who informed him that some of the men had joined the N. M. U. According to the port steward's testimony, he then asked the mate, "How is the Steward's Department?" and the mate replied, "Well some of them joined the N. M. U. . . . and later on I [the port steward] found the steward in his room. . . . I asked Pelletier did he join the N. M. U. and he said 'Yes', and I said 'What about the rest of your crew?' and he said 'Well, they all did.' I asked him did they have any reason for it, and he said, 'Yes, everybody did', so I said 'All right' and I left the ship." He returned to the Company's office. Two hours later, he came back to the ship, charged Pelletier with incompetency and discharged him. Pelletier testified that the port steward, when told that the crew and Pelletier had turned N. M. U. said, "Well I have got orders to lay you all off." Pelletier had been promoted just prior to the voyage in question. A new I. S. U. man was put on to finish up his work and remained on as watchman practically the full time the "Bienville" was laid up.

Although her captain had, prior to the coming aboard of a Company official, expressed a desire to keep the "Fairland's" crew, as one of her crew testified, the crew was informed by this official that they could not sail, "but if you take your books and give them to . . . the I. S. U. you can keep your jobs"; another Waterman official "told me I could not sail on any Waterman steamship as long as I was an N. M. U. man." According to this witness, he had left his clothes on the "Fairland" and slept aboard ship when she was in dry dock with the understanding he would re-sign; he was, however, ordered off the ship.

An engineer on the Waterman vessel "Azalea City," eight years with the Company, O'Connor, a member of the M. E. B. A., (also affiliated with the C. I. O.) testified that he acted as spokesman for other engineers on his ship in complaining about working conditions, hours of employment and rates of pay; when he discussed the complaint with the Company's representative, during July, he was told to take a vacation and left the ship on a promise of a more desirable job; neither the vacation, the promised job, nor re-employment of any kind was ever given him. Waterman's executive vice-president had never had an engineer act in such a representative capacity relative to asserted violations of a union contract. And the assistant port engineer stated that it was the custom to call a man of O'Connor's rank when not on vacation; that O'Connor had been promised and then denied a vacation, but had not been called although work had been available; and, in addition that O'Connor had in conversation with him asked "Would Waterman give me employment."

The executive vice-president of the Company would not "until the actual time came" answer the query whether he would reinstate the N. M. U. men even if there were no contract with the I. S. U. He stated that he had received a wire from the Board's regional Director at New Orleans on July 7, recommending and insisting on reinstatement of N. M. U. men dismissed at Mobile, and did not deny that he had first told the Director that his reason for not working N. M. U. men was the existence of the I. S. U. contract. He admitted, however, that later on the same day his decision that the men were removed because the vessels were laying up was attributable to an apparent change of his own mind.

Additional evidence that the discharged N. M. U. men were again treated with discrimination in the allotment

of repair work on the "Bienville" and "Fairland"; and were laid off in a block even from this work—all tended to buttress and illuminate the Board's finding that the tenure of employment of these men of the "Bienville" and "Fairland" was cut short because they had exercised their lawful right to join the C. I. O. One of the men who was given temporary repair work—subsequent to the Board's telegram of the seventh—testified:

"Q. While you were a member of the N. M. U., did you ever wear your N. M. U. badge or button?

"A. Yes, sir; I used to wear it on my cap, on the dock while I was working down there.

"Q. Was there anything ever said to you at the Waterman Steamship about wearing it?

"A. Mr. Ingram told me I would have to take that Maritime Union button off if I wanted to stay around there, and I took it off, and put it in my pocket."

From all this evidence, there can be no doubt of the substantial support for the Board's finding that the crews, O'Connor. and Pelletier all lost their jobs because of C. I. O. affiliation and activities.

*Evidence of Discrimination as to ships' passes.*—The Board found "that the respondent, by issuing passes to representatives of the I. S. U. and refusing to grant such passes to representatives of the N. M. U. for the same purpose and under the same conditions, had interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in Section 7 of the Act." [13] An election to permit a choice of bargaining agency by

---

[13] The Board ordered, as to ships' passes, that the Company "Cease and desist:

"From refusing to issue passes to authorized representatives of the National Maritime Union of America in equal numbers and under the same conditions as it grants passes to representatives of the International Seamen's Union of America or its successors; . . ."

the crews has been directed but has not been held pending termination of the present proceeding.[14]

Upon this issue of discrimination concerning passes, N. M. U.'s representative testified that the Company's executive vice-president, about September 24 or 25, 1937, refused his request "for passes for the election of the N. L. R. B.", because of the I. S. U. contract. But no provision of the I. S. U. contract referred to ships' passes for representatives of other unions. The respondent's attorney took the position that N. M. U. representatives would not be permitted on board under any conditions. Testifying that I. S. U. representatives were permitted aboard the "Bienville" at all times to contact the men, Pelletier "did not recollect seeing anyone with them." Waterman's executive vice-president who pointed out that I. S. U. delegates were given passes on certain conditions, such as taking out insurance for delegates going aboard, did not know whether in fact there had been compliance by the I. S. U. with the conditions. He testified that he had issued instructions, July 13, to permit I. S. U. representatives aboard ship only to collect dues. But he also testified that they were still permitted to contact members. The master of the "Fairland" stated that he did not receive the instructions of July 13 until August; and that even after the instructions were put in effect, he permitted I. S. U. representatives to board ship unaccompanied; he did not know what they said to the men; whether they brought literature aboard or whether they restricted themselves to the collection of dues. Although always present at the paying off and signing off of articles, when the I. S. U. representatives collected dues, the Company's port captain "did not pay any strict attention whatever to what they were doing." Asked whether he knew what these representatives did at such times, he

---

[14] See 12 N. L. R. B. 766, 767, 769.

replied, "I did not follow them around to see what they were doing."

Enough has been shown to establish the reasons for the Board's decision that if the Company was to permit any opportunity for contact with the men, a fair election required that equal opportunities be given to both the C. I. O. and the A. F. of L. The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone.[15] Interference in those matters constituted error on the part of the court below.

All of this is not to say that much of what has been related was uncontradicted and undenied by evidence offered by the Company and by the testimony of its officers. We have only delineated from this record of more than five hundred pages the basis of our conclusion that all of the Board's findings, far from resting on mere suspicion, are supported by evidence which is substantial. The Court of Appeals' failure to enforce the Board's order resulted from the substitution of its judgment on disputed facts for the Board's judgment,—and power to do that has been denied the courts by Congress. Whether the court would reach the same conclusion as the Board from the conflicting evidence is immaterial and the court's disagreement with the Board could not warrant the disregard of the statutory division of authority set up by Congress.

The cause is reversed and remanded to the Court of Appeals with directions to enforce the Board's order in its entirety.

*Reversed.*

·MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

---

[15] *American Federation of Labor* v. *Labor Board,* 308 U. S. 401; *National Labor Relations Board* v. *Falk Corporation,* 308 U. S. 453.