**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FRESH'ND-AIRE COMPANY, Division of Cory·Corporation, Respondent.**

**No. 11422.**

United States Court of Appeals Seventh Circuit.

Oct. 13, 1955.

Rehearing Denied Nov. 16, 1955.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Theophil C. Kammholz, Chicago, Ill., Gen. Counsel, David P. Findling, Asst. Gen. Counsel, Frederick U. Reel, Washington, D. C., for N. L. R. B.

Stanford Clinton, Robert A. Sprecher, Chicago, Ill., for Fresh'nd-Aire Co., respondent.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

DUFFY, Chief Judge.

The Labor Board brings this action seeking to enforce its order of January 7, 1955 requiring respondent to bargain collectively with the Union certified by the Board in proceedings which respondent contends were invalid.

Respondent manufactures principally electric air-conditioning units and fans in Grays Lake, Illinois, a community of about 2,000 population. The business is seasonal. The products manufactured are shipped in interstate commerce. No jurisdictional issue is involved.

On January 30, 1953, the Union filed with the Board a Petition for Certification of Representatives under § 9(c) of the National Labor Relations Act, 29 U. S.C.A. § 159(c), covering all production and maintenance employees. An election was conducted on May 8, 1953. The tally of ballots showed 100 employees cast valid ballots, of which 79 were "for" and 21 "against" the petitioning Union. Respondent filed objections based upon alleged improper conduct on the part of a field examiner of the Board.

About the time the Union filed its petition for election it filed a claim of unfair labor practice against the respondent. The attorney for respondent claims that filing such a charge is often a part of a union's campaign strategy. The Union held organizational meetings at two of which a field examiner for the Board was present. On one occasion, at least, he addressed the employees present stating he was there to obtain information based upon the charge filed by the Union. At another occasion the examiner entered enthusiastically into the social activities of the Union sponsored meeting by playing upon a piano for the entertainment of those present.

The Regional Director recommended that respondent's objections to the election be overruled, and that the Union be certified as the bargaining representative. However, on August 10, 1953, the Board sustained respondent's objections and set aside the election and directed that a second election be held within 30 days. The second election was held on September 3, 1953.

On August 26, 1953, respondent's counsel wrote to the Regional Director of the Board requesting that the Board communicate in some effective manner to the employees of respondent who would be permitted to vote in the September 3, 1953 election:

"1. The exact basis for the setting aside of the election of May 8, 1953;

"2. The employer was not guilty of any conduct which caused the election to be set aside; and

"3. That the Board is not taking sides in the election and is completely disinterested as to which way the employees vote."

This request was refused. At the hearing respondent offered to prove that representatives of the Union informed employees, and many of them so believed, that the reason the Board set aside the first election was due to some illegal or

improper conduct on the part of respondent. This offer of proof was rejected by the trial examiner.

Thirty-five employees cast ballots at the September 3rd election. Of 29 valid votes, 13 voted "for" and 16 voted "against" the petitioning Union. Forty-five ballots were challenged. Respondent did not file objections to the conduct of the election or conduct affecting the results of the election. Section 102.61 of the Board's Rules and Regulations provides that any such objections shall be filed within 5 days after the Tally of Ballots has been furnished.

Since the number of challenged ballots was sufficient to affect the results of the election, the Regional Director investigated and reported on the challenged ballots on October 5, 1953. He recommended no disposition be made of 4 challenges, that 10 be sustained, and 31 be overruled. Of the 31 challenges overruled, 30 were in connection with employees who had been laid off prior to the election and who had voted by mail ballot. On August 24 respondent had objected to any employee being permitted to vote by mail. A revised Tally of Ballots was issued on January 29, 1954 which disclosed that 42 employees had voted for the Union, 18 had voted against the Union and 4 were challenged.[1]

Respondent points out that at the peak of its manufacturing season it had 192 employees, and contends that it was unfair for the Board to order an election at a time when it had only 35 employees at work. In the instant case the Board directed that temporarily laid-off employees were eligible to vote. The Regional Director obtained from respondent a list of employees who were in a laid-off status. The Company's list showed 93, each of whom was furnished with a ballot to be cast by mail. 30 of such employees did cast their ballots. Respondent contends that none of these ballots should be counted or, at least, the ballots of the laid-off employees who had

not yet been re-employed should not be counted.

Did the Board err in counting the ballots of 30 laid-off employees? Whether such an employee is eligible to vote in a Board election is a question to be determined by his reasonable expectation of re-employment within a reasonable time in the future. Whiting Corporation v. National Labor Relations Board, 7 Cir., 200 F.2d 43, 45; Marlin-Rockwell Corporation v. National Labor Relations Board, 2 Cir., 116 F.2d 586, 588. The Board customarily directs that "temporarily laid-off employees" are eligible to vote. See cases cited in Whiting Corporation v. National Labor Relations Board, 200 F.2d 43, 45. We think there is sufficient support in the record to show reasonable expectation that the 30 who voted would be re-employed within a reasonable time in the future. We also are of the view that permitting laid-off employees to vote by mail did not invalidate the election.

The fact that the second election was set within 30 days of the date of the setting aside of the first election, and this date happened to fall during a period of low employment by respondent does not, in itself, result in the Board's action being arbitrary or capricious. However, a more serious question is presented in the claim of respondent that the prejudicial action of the Board's trial examiner in attending two Union organizational meetings carried over into and invalidated the second election.

A heavy responsibility rests upon the Board to conduct fair elections. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. The employees must be given a fair and free choice in selecting bargaining representatives. It has been well stated: "A certification proceeding is of a nonadversary, fact-finding character in which the Board plays the part of a disinterested investigator seeking merely to ascertain the desires

---

[1]. As the Union had a substantial margin of victory the eligibility of the 4 voters became a moot issue.

of the employees as to their representation." Southern Steamship Co. v. National Labor Relations Board, 3 Cir., 120 F.2d 505, 506–507.

In fact, the Board has defined the role which it should play when it said in General Shoe Corporation, 77 N.L.R.B. 124, 127: "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish those conditions; it is also our duty to determine whether they have been fulfilled. When, in the rare extreme case, the standard drops too low, because of our fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again."

The conduct of the field examiner in attending both organizational meetings of the Union was indefensible. It is obvious that the presence of a representative of the Board in the midst of organizational activities of the petitioning Union gave an apparent authority to the efforts of the petitioning Union which violated the Board's duty of neutrality. Strangely, such conduct did not impress the Regional Director as improper, for he recommended that the objections to the first election be overruled. However, the Board, recognizing the great impropriety of the field examiner's actions, set aside the first election. While we find that it was within the scope of the Board's discretion to fix the date of a second election within 30 days' time, yet, the duty was on the Board to be certain that there was no carry-over of the field examiner's improper action into the second election.

Respondent's factory was located in a small community, and we may take judicial notice that news would there travel by word of mouth in a rapid manner. The Board recognized a similar situation in Bonita Ribbon Mills, 87 N.L.R.B. 1115.

Respondent brought to the Board's attention, prior to the holding of the second election, the claim that the Union was carrying on a campaign of misrepresentation in stating that the second election was caused by some illegal or improper action on the part of respondent. In view of the fact that it was the actions of the Board's own representative which caused the setting aside of the first election, it was the duty of the Board to lean over backwards to be certain that the taint of such conduct was not present when the second election was held. In view of the alleged misrepresentation being then made by the Union, we conceive it to have been the duty of the Board to have acquainted the employees of respondent with the true situation, and that failing to do so, the election was unfair to respondent.

The Board insists it was justified in overruling respondent's protests as to the validity of the second election because formal objections were not filed by respondent within five days. In the ordinary case the Board would be justified in insisting upon objections being filed within the 5-day period as provided by Board Rule. In National Labor Relations Board v. Conlon Bros. Mfg. Co., 7 Cir., 187 F.2d 329, 332, we held the Rule was not unreasonable. But this is not the ordinary case. Here it was the conduct of the representative of the Board that was improper. The Board had already recognized the impropriety and prejudicial effect of his actions. If the Board was going to insist that another election be held within the short period of 30 days after the setting aside of the first election, it should have taken steps to prevent any taint of its employee's conduct from reaching into the second election. The Board was told by respondent of the false representations being made to its employees as to why the first election had been set aside. Where the Board's representative had caused the unfair condition to exist, the least it could have done was to let it be known to all concerned that it was neutral in the election.

Respondent strongly voiced its objections before the second election was held. Under the circumstances of this case we

742

do not think it was fatal to respondent's demand that the election be fairly conducted and that the Board act in a neutral manner, that respondent failed to renew its objections within the 5-day period.

It seems to us that the instant case comes in the category to which the Board referred in its opinion in General Shoe Corporation, 77 N.L.R.B. 124. Here the standards dropped too low because of the fault of the representative of the Board. We think, in fairness to everyone, that another election should be held under conditions that would demonstrate the impartiality of the Board as to the outcome of that election.

The petition for enforcement is Denied.