ROCKWELL MANUFACTURING COM-
PANY, KEARNEY DIVISION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 14257.

United States Court of Appeals
Seventh Circuit.

March 31, 1964.

Rehearing Denied En Banc
May 19, 1964.

Swygert, Circuit Judge, dissented.

Kenneth C. McGuiness, Washington,
D. C., Theophil C. Kammholz, Chicago,
Ill., for petitioner. Vedder, Price, Kauf-
man & Kammholz, Chicago, Ill., of coun-
sel.

Marcel Mallet-Prevost, Asst. Gen.
Counsel, Vivian Asplund, Atty., N. L. R.
B., Washington, D. C., Arnold Ordman,
Gen. Counsel, Dominick L. Manoli, As-
sociate Gen. Counsel, Elliott Moore, Atty.,
N. L. R. B., for respondent.

Before DUFFY, KNOCH and SWY-
GERT, Circuit Judges.

KNOCH, Circuit Judge.

This matter is before us on the petition of Rockwell Manufacturing Company, Kearney Division, hereinafter called "Rockwell," to review [1] and set aside the decision and order [2] of the National Labor Relations Board.

The Board found that Rockwell violated § 8(a) (5) of the National Labor Relations Act, by refusing to recognize and to bargain with United Steelworkers of America, AFL–CIO, hereinafter called the "Union," as the authorized representative of Rockwell's employees, and by granting unilateral benefits to Rockwell employees; and that Rockwell further violated § 8(a) (1) by coercive interrogation of employees concerning their union activities and sympathies, and by threatening reprisals or promising benefits to induce abstention from such activity.

In its answer, the Board has requested enforcement of its order. No jurisdictional issue is presented.

On February 19, 1962, the Union filed a representation petition with the Board seeking certification as bargaining agent for Rockwell's employees.

On March 6, 1962, Rockwell and the Union entered into a Stipulation for Certification upon Consent Election to be held March 21, 1962, at Rockwell's plant in Kearney, Nebraska.

We need not detail the facts on which the Board bases its finding of § 8(a) (1) violation through interrogation, prior to the election, as Rockwell states it will not contest these findings, although in Rockwell's opinion, the Board did not correctly resolve the issues of credibility involved in assessing and weighing the testimony.

The election was held, and the Union won by 50 to 49, with one ballot held to be void. Rockwell filed timely objections to the election, alleging that a general atmosphere of anxiety had been created among the employees prior to the election, by Union suggestions to use force in enlisting members, threats of physical harm to non-Union supporters, and Union instruction in making paint bombs for possible use against the latter.

These objections were investigated by the Board's Regional Director who recommended they be overruled. Rockwell filed exceptions to this report. The Board sustained the Regional Director's recommendations and certified the Union.

Rockwell posted a notice to its employees indicating that it would not bargain with the Union because it felt that it had been denied due process and proper hearing on the matter of Union intimidation; that Rockwell would force the matter into the federal courts by refusing to accept the Board's decision in an effort to protect the interests of its employees.

Accordingly Rockwell refused to meet and bargain with the Union. In November, 1962, certain wage increases, an additional paid holiday, and some medical benefits were granted unilaterally without notice to or consultation with the Union. Rockwell explains that it was precluded from consulting with the Union as it hoped by non-recognition to secure a hearing on its charges that the Union had been guilty of coercion of Rockwell's employees in the pre-election period.

The Board asserts that in its objections Rockwell raised no issue which would justify setting aside the election. Whether to set aside an election because of incidents during the campaign period is a matter for the sound discretion of the Board. As has been frequently remarked:

" * * * Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees."

---

1. National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq., § 160(f).

2. Reported 142 NLRB No. 86, 63–1 CCH NLRB 19,285, issued May 23, 1963, amended June 25, 1963.

N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940); N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L. Ed. 322 (1946); Olson Rug Co. v. N. L. R. B., 7 Cir., 1958, 260 F.2d 255, 256–7.

Several of the incidents on which Rockwell's objections rested occurred during the critical period, i. e. after the consent to election. After certification of the Union, the Board changed its procedures, effective prospectively only, to consider (as grounds for setting aside a consent election) such electioneering conduct as occurs during the period beginning with the petition for election.

Consideration was given to threats made on two occasions by Duane Taylor, a Rockwell employee who favored the Union, but who held no position in it, to Mr. Hayes, another employee who was opposed to the Union and who stated that he voted against it. He also told the Board's investigator that he did not take the first threats seriously, that he did not believe them, and laughed at them. Two other employees who were present also said "It was all in fun." Mr. Hays reported only the second threat to his foreman, but at that time, he stated, he was not afraid of anything Mr. Taylor could do to him.

Another incident, involving paint bombs, was originally understood to have occurred after the consent to election and was investigated and considered. In its subsequent offer of proof in connection with the charges of refusal to bargain with the certified Union, Rockwell placed the date of this incident as about February 22, 1962, or before the consent to election, on March 6, 1962, which marked the cut-off date then in effect.

The Board investigator reported that all those questioned said that the matter came up at a Union meeting in connection with distribution of anti-Union literature; that someone asked what a paint bomb was. In the subsequent offer of proof, Rockwell offered to call witnesses who would testify that instructions on making paint bombs were given in response to a question: "How do you brand a scab?"

Although the Union official present asserted that the Union was seeking to make friends and recommended no violence, he did explain just how to make and use a paint bomb.

The Regional Director reported no evidence that this disclosure went beyond the meeting or received any publicity.

The Board has always considered it a question of degree whether the conduct revealed by the record is so glaring as to impair the employees' freedom of choice, necessitating a new election. General Shoe Corp. (1948) 77 NLRB 124, 126.

Each incident must be considered in the light of the precise circumstances of a particular case, having reference to the timing, proportion of employees affected, and the character of the threat.

As the exceptions filed to the Regional Director's report alleged no additional evidence which the Regional Director had overlooked respecting these incidents which were considered by him, the Board found no material issue of fact necessitating a hearing, and Rockwell's request for a hearing was denied, pursuant to the Board's rules and regulations, under which the Board may direct a hearing.

> \* \* \* if it appears to the Board that such exceptions raise substantial and material factual issues, \* \* \*

The Board requires specific evidence of conduct which prima facie would warrant setting aside the election. N. L. R. B. v. O. K. Van Storage, Inc., 5 Cir., 1961, 297 F.2d 74, 76.

At the unfair labor practice stage of the litigation, however, the Board is not required to consider new allegations and evidence pertinent to the representation issues, which could have been advanced at that earlier stage. Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 1947, 162 F.2d 435, 440–441. The Board accordingly rejected the offer of proof made at

that stage of the proceedings. We cannot agree with Rockwell that the Board exceeded its authority, nor can we concede that such exceptional circumstances were shown here as to require a departure from the Board's established and reasonable practice. Rockwell's offer of proof at the unfair labor practice stage concerned the same two objections which the Board had treated. No reason was advanced for failure to adduce at the initial proceedings, any additional evidence listed in the offer of proof at the later stage of the case.

The Union was certified in August, 1962. On September 5, 1962, in Goodyear Tire & Rubber Co., 138 NLRB 453, 455, the Board announced that it would consider conduct occurring any time after the representation petition was filed, but with respect only to petitions filed after September 17, 1962. The new rule would be inapplicable, not only to elections such as Rockwell's, which had been decided, but even to any of the numerous pending cases wherein the petition was filed prior to September 17, 1962.

Rockwell considers this procedure arbitrary and highly prejudicial to Rockwell, because it cuts off consideration of incidents prior to the consent date, outlined in Rockwell's offer of proof at the unfair labor practice stage. These alleged incidents included at least three open threats of violence by pro-Union against anti-Union employees, and a statement, by the same Union official who had described paint bombs, to the effect that "there was more than one way to get union authorization cards signed, such as using pressure or getting rough."

When in Goodyear, supra, on September 5, 1962, the Board set the cut-off date as the date of the petition, in consent elections, the rule was made applicable for a future time consistent with the policy in the case of Ideal Electric & Mfg. Co., December 14, 1961, 134 NLRB 1275, 1278, where it was said:

"Finally, we have concluded that in order to avoid undesirable confusion as to the impact of this new policy on cases currently pending before the Board, we shall not apply the new policy enunciated herein to the instant case or to others now pending * * *"

Similarly, the Board here contends that any other course of action would raise questions necessitating reinvestigation of a number of pending cases. The Board refers to its 27th Annual Report as showing that 5,432 elections of this type were conducted during the fiscal year ending June 30, 1962, and that 2,060 representation cases of all types were pending on June 30, 1962.

While Rockwell's individual situation excites our sympathy, we must admit that providing for prospective application of the new rule was neither arbitrary nor capricious. The Board may fix the effective date of its rule changes and apply its standards prospectively. N. L. R. B. v. Red Rock Co., 5 Cir., 1951, 187 F.2d 76, 78, cert. den. 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373; Optical Workers Union, etc. v. N. L. R. B., 5 Cir., 1955, 227 F.2d 687, 691, and 5 Cir., 1956, 229 F.2d 170, 171, cert. den. 351 U.S. 963, 76 S.Ct. 1027, 100 L.Ed. 1484.

Rockwell's petition for review is denied. The Board's order will be enforced.

Enforcement Ordered.

SWYGERT, Circuit Judge (dissenting).

Three incidents occurred within the period between the consent election agreement and the election which, in my opinion, required the Board to invalidate the election.

Two of these incidents involved threats made by a pro-union employee, Taylor, to Hayes, an anti-union employee. Taylor told Hayes in the presence of two other employees, "I am going to get you if the union gets in." On another occasion he said to Hayes, "Whether the union gets in or not I am going to get you." When Hayes said he had nothing to worry about, Taylor replied, "Well you better because I am going to get you." By far

the most serious incident occurred at a union meeting held before the election. Someone at the meeting asked what a paint bomb was. A union official explained how one was made but added, according to the report of the regional director, that the union was there to make friends and did not recommend violence.[1]

The general counsel for the Board says these incidents were "manifestly insufficient" to justify setting aside the election and that the Board in exercising its broad discretion in the representation proceeding acted "within reasonable bounds."

Contrary to the Board's position, similar pre-election conduct has been found sufficient for setting aside elections. In N. L. R. B. v. Tampa Crown Distributors, 272 F.2d 470 (5th Cir. 1959), the court denied enforcement of the Board's order certifying the union because two employees had received anonymous telephone calls before the election threatening their families. The court held that this constituted an atmosphere of fear rendering a free election impossible. See, e. g., Poinsett Lumber & Mfg. Co., 116 N.L.R.B. 1732 (1956); Stern Bros., 87 N.L.R.B. 16 (1949); G. H. Hess, Inc., 82 N.L.R.B. 463 (1949).

Only recently in N. L. R. B. v. Realist, Inc., 7 Cir., 1964, 328 F.2d 840, this court enforced a Board order which had upheld the regional director's action in setting aside an election—one that the union had lost. There, the employer had made statements about unionized plants moving out of the state and that without a union the employees would be afforded equal if not better benefits. We held that the employer's speech constituted an interference with the employees' freedom of choice and formed a sufficient basis for ordering a new election.

Here the shoe is on the other foot. Pro-union statements about how paint bombs were made and threats of harm to people if the union lost created an atmosphere out of harmony with the laboratory conditions which the Board must afford for representation elections.

1. The regional director's investigation of the company's objections to the election was *ex parte*. In its attempt to gain a hearing on its objections in the instant unfair labor practice proceeding, the company made the following offer of proof which was rejected by the trial examiner:

Respondent would, if permitted, call witnesses who would testify that at the second or third meeting of the union, about February 22, 1952, Steelworker representative Graham, in answer to the question "How do you brand a scab?", advised Rockwell employees on how to make paint bombs by drilling a ¼" hole in the base of a light bulb, fill- the bulb with paint, and covering the hole with a wad of gum; that at the same meeting Graham advised against using paint bombs or violence but thereafter gave instructions on how to throw bombs on the roofs of houses rather than the sides because it was more difficult to paint over shingles, and greater damage was thereby inflicted; that on or about February 15, 1962, in a Texaco Service Station at 25th Street and Avenue A, Kearney, Jim Fox, Roger Potter, and Robert Whaley asked one employee to sign a union authorization card; that when said employee replied he didn't think he was interested, Fox said, "You better sign it or you are going to die."; that, at a meeting of employees who were against the union, a union adherent declared violence would be used to keep non-union members in line; that late one morning during the week of March 5, 1962, in the plant, Duane Taylor said to an employee who actively worked against the union and was instrumental in obtaining information about violence in which the union had engaged at another plant of the company in Atchison, Kansas, "I'm going to get you if the union gets in."; that Taylor said to the same employee on another occasion, "Whether the union gets in or not, I'm going to get you."; that prior to the election, said employee told other employees of Taylor's threats; that at a union meeting about March 2, 1962, Graham said there was more than one way to get union authorization cards signed, such as using pressure or getting rough; and that about two weeks before the election two union adherents told an employee returning to his work station after dinner, "If you don't sign up with the union and the union gets in, you will be laid off."

Comparing the facts in Realist with those in the instant case, I am compelled to conclùde that the Board has applied a double standard in these cases. The general counsel refers to the wide degree of discretion the Board has in establishing safeguards to insure fair elections. He also says that the Board itself is fully cognizant of the responsibilities imposed upon it to conduct elections fairly. Neither statement is subject to dispute except for the fact that the Board's diverse treatment of these cases speaks for itself.

Moreover, the Board should have afforded Rockwell a hearing on its objections in the instant proceeding. The failure to do so was, in my opinion, a denial of due process. In a similar situation, the Fourth Circuit in N. L. R. B. v. Poinsett Lumber & Mfg. Co., 221 F.2d 121, 123 (4th Cir. 1955), said:

"If a hearing had been held and the evidence had been taken and passed upon by the Board in the representation proceeding, the Board would not be required to go into the matter again in the absence of special circumstances showing that it was in the interest of justice that this be done; but the evidence has not been taken nor a hearing accorded the company at any time even though substantial questions affecting the validity of the election had unquestionably been raised by its exceptions. We think that it is entitled to a hearing at some stage of the proceedings so that it may produce the evidence upon which it relies for consideration by the Board and for consideration by this court in proceedings to enforce or set aside the Board's order."

The Board itself has adhered to this view in Celanese Corp. of America, 125 N.L.R.B. 352 (1959), and Underwood Mach. Co., 80 N.L.R.B. 1264 (1948).

This court's decision in Olson Rug Co. v. N. L. R. B., 260 F.2d 255 (7th Cir. 1958), is inapposite; the facts are clearly distinguishable. In Olson all the evidence (campaign literature) was before the regional director in the representation proceeding. In the instant case, the trial examiner refused to consider the company's evidence which it claimed amplified the facts presented to the regional director.

I would reverse that part of the Board's order that requires the company to bargain with the union.