397 F.2d 91
 FOLLETT CORPORATION; Wilcox & Follett Company, Follett College Book Company, and Follett Library Book Company, Operating Divisions of Follett Corporation; Follett Publishing Company; and American Publishing Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 16221.
 United States Court of Appeals Seventh Circuit.
 June 10, 1968.
 
 Robert C. Claus, James S. Petrie, John P. Jacoby, Chicago, Ill., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., of counsel, for petitioners.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Fred R. Kimmel, Atty., N. L. R. B., for respondent.
 Before CASTLE, Chief Judge, and SWYGERT and CUMMINGS, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 Follett Corporation et al[1] has petitioned for a review of an order of the National Labor Relations Board.[2] A cross-petition has been filed by the Board to enforce its order.
 
 
 2
 Following a Board conducted election among Follett's employees, the Board certified the Retail, Wholesale and Department Store Union, AFL-CIO, as the exclusive bargaining representative of the employees. Despite the certification, Follett twice refused to bargain with the union, concededly in order to obtain a judicial review of the Board's certification decision. Upon its refusal to bargain, Follett was charged with violating section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1). The Board granted the General Counsel's motion for summary judgment and entered an order finding Follett guilty of the charge and ordering the company, upon request, to bargain with the union. The principal issue in this review is whether the Board abused its discretion in reversing the Regional Director's decision to set aside the election.
 
 
 3
 Consequent to the union's petition under section 9(c) of the Act and a direction by the Regional Director, an election among Follett's employees was conducted on March 16, 1966. During the election campaign, Follett distributed sixteen leaflets and letters to its employees. Two letters, dated March 10 and 11, 1966, compared wage increases and benefits contained in union contracts with other employers with those Follett had granted its employees.
 
 
 4
 Apparently in response to the company letters, the union distributed a handbill on March 14, 1966, captioned "A Special Message from Fuller Brush Co. Employees * * * (members of RWDSU)." The handbill stated that the Fuller Brush employees had voted for the union in March 1965 and in November of that year the employees negotiated their first contract "with backpay." The handbill then enumerated sixteen items "received" in the contract. One of the sixteen points mentioned in the handbill read: "the minimum rate for packers in our warehouse is $2.42 per hour + 10% annual bonus. How do your rates compare with these?" (Emphasis added.)
 
 
 5
 On March 15, 1966, the union distributed a second handbill captioned "Message from the Quaker Oats Company Employees." The handbill stated that the Quaker Oats employees chose the union in December 1964 and in May 1965 they completed their first contract with the company and "obtained the following benefits with backpay." The handbill then enumerated eighteen benefits. One of the eighteen points mentioned in this handbill read: "Time and one-half for all hours worked over 8 hours. Time and one-half for all Saturdays as such. Double time for Sundays; triple time for holidays." (Emphasis added.)
 
 
 6
 At the election, a majority of the ballots were cast for the union. Thereafter, Follett filed objections to the conduct of the election and requested that it be set aside because of misrepresentations, in the union handbills, to which the company argued it had insufficient time to respond.
 
 
 7
 In his decision setting aside the election, the Regional Director found that the "two leaflets contained misrepresentations involving substantial departure from the truth, at a time which prevented the employer from making an effective reply, and this could reasonably be expected to have had a significant impact on the election." As to the Fuller Brush handbill, the Regional Director noted that it quoted a minimum rate of $2.42 per hour, but that this rate under the Fuller Brush contract did not take effect until May 1, 1966 (the representation having been made on March 14). In addition, employees with less than eighteen months seniority were ineligible to receive $2.42 which in effect was a maximum rather than a minimum rate (starting employees received $2.00 per hour). The Regional Director concluded, "The implication is clear that Follett employees could obtain similar rates [to those stated in the handbill] if they were represented by the Petitioner [union]." As to the Quaker Oats handbill, the Regional Director found that the statement that the company's contract with the union provided for triple time for holidays was inaccurate in that the Quaker Oats' contract in fact provided double time and a half for holidays. Although the Regional Director observed that the misstatement in the Quaker Oats' handbill was "less important," he concluded that both representations constituted substantial departures from the truth, which required the election to be set aside.
 
 
 8
 The Board, at the request of the union, reviewed the Regional Director's decision and reversed it. In the Board's view, the union's quotation of the $2.42 rate was an insubstantial misstatement in that the difference between the rate in effect when the Fuller Brush handbill was distributed and the quoted rate was only 7 cents. Moreover, Follett's employees (with one exception) were only receiving from $1.45 to $1.80 an hour. The Board observed that the $2.42 rate would likely be in effect at Fuller Brush if and when the union initiated negotiations with Follett. Rejecting Follett's further contention that the misrepresentation was substantial because only employees with eighteen months or more seniority could earn $2.42, the Board observed that the voters could "reasonably construe the stated rate as applicable to permanent employees." In addition, the Board found that, "in the context of the entire election campaign," the union's misstatement of the Quaker Oats holiday pay rate was "insubstantial and an insufficient basis for setting aside the election."
 
 
 9
 After the election, the union twice requested Follett to bargain. The company refused. Thereafter, the union filed the instant unfair labor practice charges, a complaint issued, and the General Counsel then filed a motion to transfer the proceeding to the Board for summary judgment. Follett requested a hearing before the Board to prove that its employees were "in fact misled by the misrepresentations" contained in the union's handbills. Follett also contended that it was entitled to a hearing to show that certain Fuller Brush employees were earning less than $2.35 per hour on March 14, 1966, that the union's handbills were issued by union representatives "none of whom were employees" of Fuller Brush or Quaker Oats, and that some of the benefits claimed in the Fuller Brush handbill were not mentioned in the Fuller Brush Company contract.
 
 
 10
 The Board held that the defenses raised in Follett's answer to the motion for summary judgment, relating to the union's pre-election conduct, had already been ruled upon in the related representation proceeding. Accordingly, the Board granted summary judgment, finding that Follett had violated section 8(a) (5) and (1) of the Act.
 
 
 11
 The question before us is whether the Board abused its discretion in reversing the Regional Director's decision to set aside the election and order a second one. For "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S. Ct. 324, 328, 91 L.Ed. 322 (1946); Rockwell Manufacturing Co. v. NLRB, 330 F.2d 795 (7th Cir.), cert. denied, 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 94 (1964). The substantial evidence test enunciated in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951), has no applicability. Rather, we must defer to the Board's expertise unless we are prepared to say that the discretion residing in the Board was abused.
 
 
 12
 In the exercise of its discretion with respect to election campaign propaganda, the Board is required to make a balanced judgment whether last-minute statements of the parties are so misleading that they are likely to have affected the result of the election. The test is a flexible one. Inaccurate statements must be considered in the context of the overall campaign material submitted to the voters. Some untruths may be so glaring that the Board ought not overlook them. Celanese Corporation of America v. NLRB, 279 F.2d 204 (7th Cir. 1960), vacated and remanded per curiam, 365 U.S. 297, 81 S.Ct. 689, 5 L.Ed.2d 688 (1961), aff'd on remand, 291 F.2d 224, cert. denied, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1961). On the other hand, not every inaccuracy in election campaign propaganda requires the Board to intervene and set aside an election. The question is one of both degree and context.[3]
 
 
 13
 With respect to the handbill relating to Fuller Brush, the import of the document was that Fuller Brush employees were earning substantially more under a union contract than Follett's employees who were not represented by a union. We do not think that the slight inaccuracy in the handbill misrepresented the thrust of the union's message. The Board noted that the $2.42 hourly rate provision in the Fuller Brush contract was to become effective on May 1, 1966 and was likely to be in effect if and when Follett and the union bargained. Accordingly, we believe the Board was justified in concluding that the "overstatement of the rate [7 cents], in the circumstances, * * * [was not] a substantial misrepresentation." Moreover, we believe the Board was justified in concluding that the Follett employees "could reasonably construe the stated rate as applicable to permanent employees" rather than to all employees, including those just starting with the company.
 
 
 14
 With respect to the handbill relating to Quaker Oats, the Board found the misrepresentation to the effect that Quaker Oats employees received triple time for holidays "in the context of the entire election campaign to be insubstantial and an insufficient basis for setting aside the election." We believe the Board was justified in holding that this trivial error, when considered along with the entire campaign material submitted to the voters, did not warrant the Regional Director in setting aside the election.
 
 
 15
 In reversing the Regional Director's decision setting aside the election, the Board did not disturb any of his factual assumptions. Its disagreement concerned his ultimate conclusion that the misrepresentations in the handbills were so gross as to taint the election with unfairness. Since there were no material facts in dispute with respect to the representation proceedings, and since the only issue in the unfair labor practice proceeding concerned the propriety of the Board's action in the representation proceeding, the Board's disposition of the unfair labor practice charge by summary judgment was proper. Macomb Pottery Co. v. NLRB, 376 F.2d 450 (7th Cir. 1967).
 
 
 16
 The Board's order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 Petitioners, Follett Corporation; Wilcox & Follett Company, Follett College Book Company, and Follett Library Book Company, operating divisions of Follett Corporation; Follett Publishing Company and American Publishers Corporation, are related corporations (all located in Chicago) constituting a single integrated employer within the meaning of the National Labor Relations Act
 
 
 [2]
 The Board's decision and order are reported at 164 N.L.R.B. No. 47
 
 
 [3]
 We note that the union won the election by a substantial margin, 69 to 38. This factor is entitled to some consideration in assessing the effect of a misrepresentation