## NATIONAL LABOR RELATIONS BOARD v. QUALITY ART NOVELTY CO., Inc.

### No. 198.

Circuit Court of Appeals, Second Circuit.

May 22, 1942.

Robert B. Watts, Ernest A. Gross, Owsley Vose, Ramey Donovan, and Christopher Hoey, all of Washington, D. C., for petitioner.

Abraham J. Halprin, of New York City, for respondent.

George M. Glassgold, Herbert S. Klein, and Alexander Blumenthal, all of New York City, for intervenor.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The National Labor Relations Board, after hearings before a trial examiner and due consideration of his report, issued its order which it now seeks to have enforced against the respondent under the provisions of § 10(c) of the National Labor Relations Act. 29 U.S.C.A. § 151 et seq. It found that the respondent had engaged in unfair labor practices in violation of § 8(1), (2), and (3) of the Act. The order required the respondent to cease and desist (a) from dominating, interfering with the administration of, or contributing to the support of, a so-called company union or any other labor organization of its employees; (b) from discouraging membership in a named local union affiliated then with the Committee for Industrial Organization and now with the Congress of Industrial Organizations or any other labor organization of its employees by discriminating in regard to their hire and tenure of employment; (c) from giving effect to a contract it had made with the so-called company union regarding terms and conditions of employment and (d) from preventing or attempting to prevent the enjoyment by its employees of the rights as to collective bargaining et cetera which are guaranteed by § 7 of the Act. The order also required the respondent to offer full and immediate reinstatement to five discharged employees to their former positions or to substantially similar ones without prejudice to their seniority, or other, rights and to make them whole for loss of pay; to disestablish the so-called company union and to post the usual notices.

The union so ordered disestablished is the Quality Art Shop Union which was granted leave to intervene in this proceeding and has appeared and been heard in the hearings before the trial examiner, before the Board and in this Court. The jurisdiction of the Board is unquestioned and, as too often happens in proceedings like these in this Court, both the respondent and the intervenor rely in fact, though not in theory, upon the supposition that if it can be pointed out that the Board gave undue weight to certain evidence and failed to give adequate weight to other evidence the resulting unfairness in the order may be corrected by us. The National Labor Relations Act denies to us the right to weigh the evidence or to pass upon the credibility of witnesses. The scope of our review of the findings as findings of fact is limited to determining merely whether or not there is some substantial evidence to support them. N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L. Ed. 704. If there is, we must accept those findings and give them full effect under the law. In this instance all of the material findings on which the order of the Board is based are supported by testimony given by at least one witness and in the main by one or both of two witnesses named Ruderman and Goldstein. That both of these witnesses were active in support of an unsuccessful attempt by the C. I. O. to organize the respondent's employees and that both testified with whatever bias and prejudice were so engendered can be none of our concern. The record shows adequately that they might have known what they testified to be the facts and therefore whether they did or not and whether they tesified in accordance with facts known to them was for the Board. That such evidence, believed by the trier of the facts, was substantial admits of no doubt.

The facts so proved, found and accepted by us are in all essential respects as follows:

The respondent, Quality Art Novelty Co. Inc., is a New York corporation engaged in the manufacture and sale of novelty

greeting cards with its factory and principal office at Long Island City, N. Y., where it is engaged in interstate commerce. United Paper Workers, L. I. U. No. 292 is the labor organization, affiliated at the time here material, with the Committee for Industrial Organization, which admitted the respondent's employees to membership and whose attempts to obtain members led to the labor trouble on which the complaint in this proceeding was based. Quality Art Shop Union, the intervenor, is an unaffiliated labor organization with a membership limited to the employees of the respondent.

The president of the respondent was Louis Katz, the vice-president was his brother Phil Katz, and the foreman of the shipping department was another brother Joe Katz. In the fall of 1937, when some of the employees in the respondent's stock and shipping departments were advocating the organization of the respondent's employees by the C. I. O. union, Louis Katz learned of a union meeting which had been held and requested Phil Katz, Clement Swan, who was in charge of the art department, and Harry Hankoff, the credit manager and supervisory head of the stock and shipping department, to find out what grievances the employees had and report to him so that he could remedy them. In the course of their investigations one or more of them told the employees not to join the outside union; that it really wasn't any good but was composed of racketeers; and that instead of paying "a lot of dues" they could do better by dealing directly with the management. The advice of these men was not lightly to be disregarded by employees under their supervision. There was substantial evidence to support similar findings of attempts to prevent the employees joining the C. I. O. union which amounted to interference with their exercise of rights guaranteed them by § 7 of the Labor Relations Act.

■ Acting upon the suggestion of Phil Katz, the employees appointed committees to deal directly with the management. Meanwhile, and on October 21, 1937, the C. I. O. union called a meeting to be held that evening, and circulars giving notice to that effect were distributed in the respondent's plant. An inspector with authority to hire and fire some employees advised them not to attend the union meeting; a foreman questioned some of the employees about the meeting and asked whether they had been solicited to join the union telling them they had no need to go elsewhere for assistance as he had always been, and would continue to be, fair with them. And in the afternoon about one hundred and fifty of the employees were asked to assemble and were addressed by Clement Swan who told them the management was negotiating with two departments about grievances and "was ready to do the same thing with all other departments that might have had anything to complain about, or requests to make." He disparaged the C. I. O. union and advised the employees not to join it, suggesting that a vote be taken to determine whether the employees would choose an A. F. of L., a C. I. O. or a company union. Others representing the respondent attempted to discourage attendance at the C. I. O. meeting and when it was held such discouragement took the form of watching by supervising employees to find out who did attend. The next day the management began to encourage the formation of the intervenor. Though nothing tangible was contributed to its organization or maintenance by the respondent the latter did smooth the path of its organizers and patently preferred to have its employees join it instead of an outside union. Though the respondent's first choice was to have no union at all and to deal directly with committees or employees, when that failed it made the intervenor its favorite and made a contract with it recognizing it as the exclusive bargaining agent of its employees and giving them a preferential status in respect to promotion, lay-offs, and rehiring. The Board was, therefore, justified in finding, as it did, that the respondent had dominated the formation and administration of the intervenor and in that respect had "interfered with, restrained, and coerced its employees in the exercise of rights guaranteed in Section 7 of the Act" and by contracting with it, "a labor organization established, maintained, and assisted by the unfair labor practices of the respondent," had acted to further its existence in violation of the Act.

The business of the respondent is seasonal and lay-offs are at times necessary. The Board found that Goldstein, Axelrod, Korten and Cohen were employees of the respondent and members of the C. I. O. union who were laid off in March, 1938, during the usual seasonal reduction in the personnel but when other employees who had worked for the respondent a shorter time were retained because they were members of the intervenor. These employees were selected to be laid off instead of members

of the intervenor because the contract with the latter so provided.

 Helen Ruderman, who had been the ring leader in the abortive attempt of the C. I. O. to organize the respondent's plant, was first transferred for a few days, after her advocacy of the cause had been vociferous and determined, from the examining department to the box-assortment department. She was then returned to her old work, but not very long after she was put back in the examining department she was accused of numerous errors in the packages of cards she examined and passed. There was much evidence of circumstances strongly indicating that the errors were too frequent and glaring to be other than deliberate. She was confronted with the evidence and professed an inability to explain how the errors could have occurred. The Board was satisfied with her denial of intentional error even in the face of many counts so faulty that packages which should have contained a dozen cards were found by Ruderman herself when she recounted them to have, as she testified, "nines, sevens, and so forth, anything but twelves." Nevertheless the Board refused to find that she was discharged because of poor work as the respondent insisted she had been. Instead it found, "In view of her competence, and her considerable experience, we do not believe the condition of the packages in question may be attributed to any oversight on her part. Nor was she discharged upon any such ground. * * * On the contrary, we conclude, the evidence establishes that the respondent discharged her because of her union activities and her opposition to the Intervenor." Lacking as we do the power to weigh the evidence, we must needs accept this finding, for the discharged employee's own disclaimer of ability to explain the errors was some evidence of a witness with knowledge of the fact. Yet even if the Board had believed that this employee had given the respondent lawful cause to discharge her because of faulty work it also had before it substantial evidence that she had given it ample grounds for wanting to discharge her for the unlawful reason that she had engaged in union activity contrary to its wishes. It was within the province of the Board on such evidence to determine whether the discharge was for a lawful or an unlawful reason. As there was substantial evidence to support whichever way it decided, the statute cuts off a substantial review of the decision to determine whether that evidence, in the light of all the evidence in the record, does adequately and fairly support the finding. Upon the findings as made the decision of the Board, when modified in respect to the back pay provision as it requests, is clearly without error.

 The respondent was guilty of unfair labor practices in violation of § 8(1) and (2) by its attempts to prevent the organization of its plant by the outside union and its support of the company union to the same end. International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 78, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 518, 519, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Link-Belt Co., 311 U. S. 584, 597, 598, 61 S.Ct. 358, 85 L. Ed. 368; Corning Glass Works v. N. L. R. B., 2 Cir., 118 F.2d 625, 628, 629. The discharge of Ruderman and the lay-offs of the other employees hereinbefore mentioned were likewise discriminatory and unlawful. That of Ruderman was because of union affiliations and those of the remainder because of the contract with the company union which unlawfully discriminated against them. International Ass'n of Machinists v. N. L. R. B., supra; Corning Glass Works v. N. L. R. B., supra. The order made will be modified as the Board requests to eliminate the requirement to pay to public work-relief agencies the sums earned by discharged or laid-off employees and paid to them by such agencies. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. We understand the requirement that such employees be offered the same or substantially equivalent employment without loss of seniority or other rights or privileges to mean only such seniority or other rights or privileges as they would have had if there had been no unlawful discharge or lay-offs and no illegal contract with the company union. As so modified and construed the order is proper and should be enforced. N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 432, 438, 61 S.Ct. 693, 85 L.Ed. 930; N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N. L. R. B. v. Air Associates, Inc., 2 Cir., 121 F.2d 586, 592.

 The respondent has called our attention to numerous exceptions it took during the hearings to the rulings of the trial examiner. Were the strict rules which govern the examination of witnesses and the reception of evidence in jury trials at

law to be enforced it would have much cause for complaint. In hearings by and before administrative tribunals there is more latitude. N. L. R. B. v. National Seal Corporation, 2 Cir., 127 F.2d 776.

The respondent was given a fair opportunity to be heard; to test and to meet the evidence produced against it. Courts cannot assure it more than that. For fairness in weighing the evidence, determining the credibility of witnesses, and in general in finding the actual facts it, and others in like situation, must rely upon the integrity and ability of the Board.

The petition to enforce the order as modified is granted.