**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Beth E. RICHARDS d/b/a Freightlines Equipment Company, Respondent.**

**No. 12716.**

United States Court of Appeals
Third Circuit.

Argued Feb. 19, 1959.

Decided April 7, 1959.

---

Frederick U. Reel, Atty., N.L.R.B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., on the brief), for petitioner.

Leon H. Kline, Philadelphia, Pa. (Ellis Berger, Scranton, Pa., Berger, Stein & Kline, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge and GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In 1951 because of financial difficulties Richards Motor Freight Lines, operated by John Richards in Scranton, Pennsylvania, entered Chapter XI proceedings under the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. Most, if not all, of its rolling equipment was repossessed; the receiver, however, continued to operate by leasing equipment supplied with drivers. This method of doing business, necessitated dismissing all the truck drivers then working for Richards. These men were members of Teamsters Local 229 in Scranton with whom Richards had a contract containing seniority benefits and a union security clause.

About the middle of 1952 Richards established Freightlines Equipment Company in his wife's name. He arranged for the return of some of his repossessed equipment and for the use of the I.C.C. rights held by the receiver. He hired new drivers. The operation was based in Delaware, New Jersey, about fifty miles from Scranton and outside the jurisdiction of Local 229.

By December 1953 the Chapter XI arrangement had been concluded and the I.C.C. rights formerly held by Richards Motor Freight Lines passed to Richards Freight Lines which was organized at about this time to operate from Delaware, N. J., with John Richards as sole owner. The "new" business leased its equipment and drivers from Freightlines Equipment Company.

The business prospered and operations expanded. By mid 1954 much of the equipment was being brought to Scranton for servicing and many runs were being dispatched from there as a matter of convenience. By mid 1956 more new drivers had been hired, mostly from the Scranton area, and the business functioned largely from there with Scranton drivers.

Sometime after it was apparent that Richards was performing some part of his work from Scranton, Joe McHugh, business agent for Local 229, approached Richards with a suggestion that the drivers who had been laid off when Richards Motor Freight Lines ran into financial difficulties be put to work for Freightlines Equipment Company. McHugh appears to have pressed this from time to time, but Richards insisted that his undertaking was based in New Jersey outside the Local's jurisdiction. About June, 1956, at least some of the Scranton drivers employed by Freightlines Equipment Company asked McHugh for admittance to Local 229 so that the

union could represent them in negotiations with Richards.[1] McHugh pointed out that the union felt obliged first to insist on the claims of its members who had formerly been with Richards Motor Freight Lines and who desired to work for Freightlines Equipment Company. By August, 1956 the extent of Richards' Scranton venture made it impossible for him to claim that his business originated in New Jersey. It was about this time that a committee of his Scranton-based drivers who had been negotiating with him concerning wages and hours advised him that a meeting had been arranged with the Teamsters' International in Philadelphia concerning the Local's claim to priority for the Scranton jobs; the committee seems further to have indicated that they were willing to abide by the International's determination. The determination was that the former drivers were entitled to the positions.

By means which are left to inference, the union persuaded Richards to its view; those of the new drivers who declined transfer to Delaware, New Jersey, were discharged and their places taken by former drivers for Richards Motor Freight Lines; those former drivers for whom there was still no immediate vacancy were to be given first choice thereafter of jobs as they became available.

A complaint subsequently was issued against Freightlines by the Labor Board on a charge of an unfair labor practice by one of the discharged drivers. The trial examiner after hearing found no violation of Sections 8(a) (3) and (1) of the National Labor Relations Act and recommended dismissal of the complaint. The Board declined to follow this recommendation, finding instead that there had been a violation. The Board's petition for enforcement of its order brings the case here for review.

■■ Preliminarily it should be said that although the seniority provisions of

the contract between Richards as Richards Motor Freight Lines and Local 229 might have justified the employer's actions as being a bargained-for condition of employment, the evidence supports the conclusion of both the trial examiner and the Board that the contract, despite its provisions for automatic renewal had terminated. Richards was no longer operating Richards Motor Freight Lines which had gone out of existence at the conclusion of the Chapter XI arrangement. Technically his position with Freightlines Equipment Company was that of an employee. Additionally there was a hiatus from 1951 into 1954 when Richards had no dealings in any capacity with Scranton-employed drivers. It follows that Local 229 was not the bargaining representative for Freightlines employees even if Freightlines is regarded simply as a Richards operation. Still further, the return of operations to Scranton did not constitute a starting up again of a business which had left off some years before. Taken together the facts support the conclusion that the underlying assumptions upon which the parties had based their contract had so altered as to have prevented automatic renewal, subsequently the contract did not continue in effect. Cf. 3 Corbin, Contracts, §§ 565, 631, 632; 6 Corbin § 1353; 3 Williston, Contracts, §§ 668, 887 A (rev.ed.1936). The Board's findings therefore are supported by substantial evidence. So much of respondent's argument as assumes the continuing validity of this contract must perforce be rejected.

Whether the facts make out an unfair labor practice by respondent as defined in Section 8(a) (3) and (1) of the National Labor Relations Act is the question decided by both the Board and its trial examiner and to which we now come. Section 8(a) (1) and (3), 49 Stat. 452 (1935) as amended, 29 U.S.C.A. § 158 (1952), read in pertinent part:

1. Apparently some of these men held withdrawal cards from Local 229. A withdrawal card is issued to a member when he goes to work in another trade; it entitles him to readmission to the local at any time.

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title,[2] * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * * "

"The language of § 8(a) (3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1954, 347 U.S. 17, 42, 74 S.Ct. 323, 337, 98 L.Ed. 455.

■ An employer can discriminate without being guilty of an unfair labor practice so long as he does not thereby intend to encourage or discourage union membership or activity. But it is recognized that proof of certain types of discrimination is sufficient proof of intent to encourage or discourage union activity; this " * * * is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct." Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., supra, 347 U.S. at page 45, 74 S.Ct. at page 338.

■ Sometimes an employer cannot avoid discriminating among his employees; for instance, business conditions frequently dictate a contraction in the size of a labor force. When an employer lays off some employees while retaining others in such a situation, he is acting discriminatively. If his criterion for selecting those to be laid off is intended to discourage or encourage union activity, he commits an unfair labor practice. N. L. R. B. v. Quality Art Novelty Co., 2 Cir., 1942, 127 F.2d 903. But if his criterion is, for example, individual employee efficiency or seniority, then something more would be necessary for showing an unfair labor practice. See Martel Mills Corp. v. N. L. R. B., 4 Cir., 1940, 114 F.2d 624. It is possible that the criterion adopted, though alone reasonable enough, may have the foreseeable result of affecting union activity, in which case the employer commits an unfair labor practice. Cf., Republic Aviation Corp. v. N. L. R. B., 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 1947, 162 F.2d 435.

■ In this matter the lay-offs were not dictated in the first instance by a necessity to contract the operation of the business. They were apparently motivated purely by the fear of union reprisals and, as the Board found, not by considerations of seniority. The Board pointed to the evidence showing that Richards was not disposed to recall his former employees until Local 229 claimed the jobs. We think this inference is amply supported by substantial evidence on the whole record and that the trial examiner erred by not taking it into account. These discharges must be regarded as coupled with the immediate hiring of replacements preferred by the union.

2. § 157, Title 29 reads:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities * * * and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment * * * "

■ It has not been urged, nor could it reasonably be, that there has been no discrimination against the newer drivers in favor of the former ones. See N. L. R. B. v. Local 542, International Union of Operating Engineers, 3 Cir., 1958, 255 F.2d 703, 705. That the employer's sole idea was to avoid possible economic loss from threatened union reprisals does not excuse the discrimination and its readily foreseeable concomitant of encouragement to union membership. True, the immediate encouragement is not to those who were discharged, since they had been refused effective membership, at least so long as they occupied positions coveted by the union. But it is not necessary for the persons encouraged to be those who were discriminated against. It is enough that those who are already union members be encouraged by the employer's discrimination to retain their membership. See Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N. L. R. B., supra, 347 U.S. at page 51, 74 S.Ct. at page 341. And the inducement could react also upon those discriminated against since conceivably they may be reemployed after all the former drivers have been accommodated.

■ Reduced to simplest concepts, the case is one of an employer discharging employees in order to replace them with men favored by the union. The situation in reverse where union employees are discharged in favor of men belonging to another or no union is a well recognized unfair labor practice. N. L.R.B. v. Waterman S.S. Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. The only difference between the two situations is that in the latter the result is to discourage union activity on the part of the remaining and new employees, while in the former that activity is encouraged. Both results are prohibited to the employer by § 8(a) (3).

■ Respondent contends that the displaced employees are virtually in the position of having consented to their discharges because of the assertion by their bargaining committee that they would abide by the ruling of the International. But as the Board pointed out, the record contains nothing concerning the selection, composition, or authority of this committee. Even if the committee had been shown to have authority the Board would not be barred from finding an unfair labor practice resulting from implementation of the International's determination of the dispute. Section 10(a) of the Act, 29 U.S.C.A. § 160 (a) (1952), empowers the Board to prevent unfair labor practices in the public interest, and provides that the power shall not be affected by any other means of adjustment established by agreement. See N.L.R.B. v. International Union, United Automobile, Aircraft and Agricultural Implement Workers, 7 Cir., 1952, 194 F.2d 698.

The fact that the principal figure, Richards, has dealt less than fairly with all concerned, makes this a case peculiarly apposite for requiring the respondent employer to resist those demands of the union which would infringe the rights of the newer employees, even at the plain risk of some expense to the respondent. For the respondent is not without remedy at law should the union's means in seeking reemployment for the former drivers—a reasonable enough end—overstep legal bounds.

■ The concurrence of discrimination and enocuragement to union membership proscribed by § 8(a) (3) is also an interference with and a restraint upon employees' rights (in the absence of a collectively-bargained contract) not to be members of a union. Therefore, a violation of § 8(a) (1) is also made out. Yet that section's incorporation by reference of § 7 of the Act is insufficient justification for including in the order a restraint of other acts within the ambit of § 7 but without any other relation to this proceeding. In these circumstances paragraph 1(b) of the order, which is drawn in the sweeping language of § 7 of the Act will be denied enforcement. N.L.R.B. v. Express Publishing Co., 1941,

312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; N.L.R.B. v. Local 369, International Hod Carriers' Bldg. and Common Laborers' Union, 3 Cir., 1957, 240 F.2d 539.

The respondent has here for the first time raised an additional objection to that part of the Board's order which awards loss of pay from September 8, 1956. Respondent claims that loss of pay should start to run from January 11, 1957 on the ground that the more than four month delay in filing charges with the Board was not warranted and that to impose expense on respondent for this seeming unreasonable delay would be wrong. See, e. g., N.L.R.B. v. Walt Disney Productions, 9 Cir., 1944, 146 F.2d 44, 50.

 Section 10(e) of the Act, 29 U.S.C.A. § 160(e) (1952), says that no objection which was not urged before the Board shall be considered by the reviewing court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. Because of the trial examiner's recommended decision in its favor, respondent did not file exceptions to his findings with the Board. See Rules and Regulations of the N.L.R.B., 29 C.F.R. § 101.12. Neither the National Labor Relations Act nor the Board's rules require that a question of law created by the Board's order be raised initially before the Board by a proceeding analogous to a petition for rehearing in an appellate court or a motion to amend the judgment in a trial court. See F.R.Civ.P., Rule 59 (e), 28 U.S.C.A. Procedural fairness prohibits foreclosure of consideration of the question. It follows that we cannot now pass upon that problem since we have no more than the bare assertion by respondent that delay in filing the charges with the Board was unjustifiable. The case must go back to the Board for a decision on this phase. N.L.R.B. v. Condenser Corp., 3 Cir., 1942, 128 F.2d 67, 78.

With the exceptions noted in the opinion, the order of the Board will be enforced.