BELOIT CORPORATION, CASTINGS DIVISION, a SUBSIDIARY OF HARNISCHFEGER INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Intervening Respondent.

Nos. 87-2230, 87-2409.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1988.

Decided Sept. 20, 1988.

R. Clay Bennett, Keck Mahin & Cate, Chicago, Ill., for petitioner.

Frederick Havard, N.L.R.B., Washington, D.C., for respondent.

Before WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case is before the court pursuant to an NLRB order finding petitioner (the Company) in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (the Act). The Board found that the Company had refused to bargain with and supply information to the intervening respondent (the Union), which the respondent (the Board) had recently certified as the exclusive bargaining representative of the employees. The Company admits that it has declined to bargain with the Union on the basis that it has no duty to bargain because the NLRB certification was improper. Under section 10 of the Act, the company can obtain judicial review of the NLRB certification and the underlying representation proceedings only through declining to bargain and after a Board determination that declining to bargain was an unfair labor practice in violation of section 8(a)(5). 29 U.S.C. §§ 158(a)(5), 160. We decline to enforce the Board's decision and order.

## I. FACTUAL BACKGROUND

On November 19, 1986, the Union filed a petition with the NLRB seeking to represent certain employees at the Company's South Beloit, Illinois, location. The Board's Regional Director conducted a hearing on the petition December 5. At the hearing the Company argued, among other things, that none of thirty-four laid-off employees were eligible to vote in the representation election, because they did not have a reasonable expectation of recall. After the hearing, on December 17, the Company announced that it planned to shut down its facility for an eleven-day period due to a downturn in business. The Company sent a letter the same day to the Regional Director to reopen the representation hearing record and receive into evidence the written notice that the Company planned to post notifying its employees of the shutdown.

The Regional Director issued his Decision and Direction of Election on December 19, and summarily denied the Company's motion to reopen the record, stating that "[w]hile this additional evidence appears relevant to the expectation of recall issue, I find that it is not material." The Director also concluded in his decision that ten of the thirty-four laid-off employees had a reasonable expectation of recall, and were therefore eligible to vote in the election.

On December 24, the Company requested that the Regional Director postpone the representation election because of the Company's eleven-day shutdown from December 25, 1986 to January 4, 1987. The Company cited section 11284 of the NLRB Casehandling Manual, which includes "[e]mployer's slack or closedown period" as an appropriate reason for extending the election date. The Regional Director denied the motion on December 29, finding "no sufficient reason for postponement." The Director set the election for January 16, 1987.

Via telegram dated December 30, the Company requested the Board to overrule the Regional Director and postpone the election. The Company followed up this request on January 6, 1987, with a request that the Board review the Regional Director's Decision and Direction of Election. The Company stated as grounds for review that the Director had (1) improperly concluded that ten laid-off employees had a reasonable expectation of recall and were therefore eligible to vote, and (2) improperly refused to reopen the record to accept previously unavailable evidence relating to the layoff issue.

The Board summarily denied the Company's request to overrule the Regional Director's decision not to postpone the election on January 8. On January 15, the Board issued an order denying the Company's request for review of the Director's decision, finding that it "raise[d] no substantial issues warranting review." The Board also found that there was no reason to reopen the record.

The election took place as scheduled on January 16, 1987. Of the valid ballots cast fifty-two were in favor of representation by the Union and fifty were against. The Board agent did not permit the Company's observer to challenge ballots cast by any of the laid-off employees the Board had earlier found to be eligible to vote.

The Company, on January 22, filed various objections to the conduct of the election. The Regional Director issued a supplemental decision on the Company's objections and its certification of representation on February 6, finding several of the Company's objections to be attempts to relitigate issues previously decided, and the others to be insufficient to warrant setting aside the election. He thus overruled the objections and certified the Union as the representative of the unit employees. The Company requested the Board to review the Regional Director's decision.

Shortly after certification, the Union requested that the Company bargain with it. The Company refused, and the Union filed an unfair labor practice charge. On March 26, the Board issued a complaint alleging that the Company had violated sections 8(a)(1) and (5) of the Act. The Company filed an answer on April 1, admitting its refusal to bargain and to furnish requested information to the Union, but denying that this conduct violated the Act, claiming that

the Union was improperly certified. The Union's general counsel moved for summary judgment.

On May 27, the Board summarily denied the Company's request for review of the Director's decision, finding "no substantial issues warranting review." On May 28, the Board issued a notice to show cause why the general counsel's motion for summary judgment should not be granted. The Company filed its response June 10.

On July 30, the Board found that the Company had unlawfully refused to bargain with the Union in violation of the Act and granted the general counsel's motion for summary judgment. The Board ordered the Company to bargain with the Union and furnish it with its requested information. The Company appealed the Board's decision and order on August 4, 1987.

## II. DISCUSSION

### A. Standard of Review

■ Because the Company concedes that it has refused to bargain and provide the Union with information, it is in violation of sections 8(a)(1) and (5) of the Act, unless, as the Company contends, the Union was not properly certified.

The Board enjoys broad discretion in establishing the rules for election campaigns, *Mosey Mfg. Co. v. NLRB,* 701 F.2d 610, 615 (7th Cir.1983) (en banc), and "[w]e will defer to the Board's selection of rules and policies to govern a particular election so long as those rules are reasonable." *NLRB v. Browning–Ferris Indus. of Louisville,* 803 F.2d 345, 347 (7th Cir.1986). Where factual issues are contested, the Board's factual determinations will be sustained if they are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *NLRB v. Burkart Foam, Inc.,* 848 F.2d 825, at 832 (7th Cir.1988); *Mosey Mfg.,* 701 F.2d at 614. As we stated in *NLRB v. Indianapolis Mack Sales & Serv., Inc.,* however, "[a]lthough this standard of review accords the Board considerable discre-

tion, it does not mean that we will simply rubber-stamp its decisions, thereby substituting judicial abdication for judicial review." 802 F.2d 280, 283 (7th Cir.1986). Moreover, unlike district court decisions, administrative agency decisions

> cannot be sustained on a ground appearing in the record to which the agency made no reference; to the contrary, the Board's decision stands or falls on its express findings and reasoning.... The Board's appellate counsel cannot fill in the holes in the agency's decision; stated in another manner, it is the Board's order, not its petition for enforcement, that is the subject of our review. Thus, the *post hoc* arguments come too late.

*Id.* at 285. In analyzing the Board's decision and order, we must also examine the underlying opinion of the Regional Director, who directed the election and certified the Union as the representative of the employees.

### B. Issues

■ The primary issue that the Company raises on this appeal is the propriety of the Regional Director's ruling that ten laid-off employees were eligible to vote in the representation election. The Company argues that the Director's action was improper for three reasons: (1) the record demonstrates that the ten employees had no reasonable expectation of recall, (2) the Director improperly refused to reopen the record to admit relevant evidence confirming that the employees had no reasonable expectation of recall, and (3) the NLRB improperly permitted laid-off employees to vote without allowing the Company to challenge their ballots. The Company also challenges the Director's refusal to postpone the election and certain of the Union's campaign practices. Because we agree with the Company that the Regional Director's finding that ten of the thirty-four laid-off employees had a reasonable expectation of recall was unsupported by the evidence, we need not discuss the Company's other arguments.

### C. Expectation of Recall

The Regional Director found that ten of the Company's thirty-four laid-off employ-

ees had a reasonable expectation of recall in the foreseeable future based on the following subsidiary findings.

The record shows that in 1985 the Employer laid off 17 production and maintenance employees from jobs throughout the foundry because of a lack of work. All but one of these employees were laid off in the last two months of 1985. The record also shows that the Employer laid off an additional 17 people in 1986 and that seven of these layoffs occurred in January 1986. Thereafter one or two employees at a time were laid off throughout the rest of 1986, again, because of a lack of work. The Employer recalled employees in both 1985 and 1986, but there is no clear evidence of how many employees were recalled. The Employer recalled these employees because of an upturn in business.

The most significant recent change in the Employer's employment level at the South Beloit foundry occurred in 1984 when 50–60 employees transferred to South Beloit from the main plant when that plant shut down casting production. The shutdown caused a backlog of orders to be filled so that, in addition to the transferees, the Employer hired new employees.

When the 34 employees at issue here were laid off, they were told that if there were openings in the future, the Employer would give them serious consideration for recall, depending on their ability to do the job. The laid-off employees were also told that they would remain on a recall list for a maximum of two years or the length of their seniority, whichever is less. Once an employee is removed from the recall list, he may still be recalled but that likelihood appears remote. The laid-off employees were not told when they might expect to be recalled, but they were also not told that they should look for other employment. These employees were not told whether the layoff was permanent or temporary.

Laid-off employees remain on the Employer's payroll until they are removed from the recall list. They also receive insurance coverage for two months after their layoff, and then the laid-off people have further options to pay their own premiums.

The Employer testified that the casting-foundry industry is very competitive but that its sales and production levels have remained stable throughout 1985 and 1986. The Employer stated that it had no plans to change its present level at the South Beloit foundry because it expects no improvement in business in the foreseeable future.

*Beloit Corp. v. UAW*, No. 33–RC–3151, slip op. at 10–11 (December 19, 1986) (Regional Director's Decision and Direction of Election). The Director found that the ten employees who were laid off in the course of 1986 were in a different position from the other twenty-four laid-off employees. They had been laid off for a shorter period of time as a result of "routine slight fluctuations" in the Company's business. The Director also found significant the fact that the Company had recalled employees as recently as one month before the hearing.

It is well established that laid-off employees are ineligible to vote in a representation election, unless they have a reasonable expectation of recall in the foreseeable future. *S & G Concrete Co.*, 274 N.L.R.B. 895, 896 (1985); *Monroe Auto Equip. Div. of Tenneco Automotive*, 273 N.L.R.B. 103, 105 (1984); *The Marley Co.*, 131 N.L.R.B. 866, 869 (1961). See also *NLRB v. Speedway Petroleum, Div. of Emro Mktg. Co.*, 768 F.2d 151, 158 (7th Cir.1985); *NLRB v. Fresh'nd–Aire Co.*, 226 F.2d 737, 740 (7th Cir.1955). In determining whether a laid-off employee has such an expectation, the Board considers four objective factors: (1) the employer's past experience, (2) the employer's future plans, (3) the circumstances surrounding the layoff, and (4) what the employees were told about the likelihood of recall. *Windsor Woodworking, Inc. v. NLRB*, 647 F.2d 859, 861 (8th Cir.1981); *Sol–Jack Co.*, 286 N.L.R.B. 113 (1987); *S & G Concrete*, 274 N.L.R.B. at 896; *Monroe Auto*, 273 N.L.R.B. at 105; *Atlas Metal Spinning Co.*, 266 N.L.R.B. 180 (1983).

The Regional Director did not expressly rely on these four factors in making his

determination that ten of the laid-off employees had a reasonable expectation of recall. Instead, the Director seems to have based his decision on the facts that ten employees had been laid off for a shorter period than the other twenty-four, that the ten were laid off in response to routine slight fluctuations in the Company's business, and that the Company had recalled employees a month before the hearing. None of these factors supports a reasonable expectation that these ten employees would be recalled in the foreseeable future. Nor does consideration of the four factors generally used by the Board in making this determination support the Regional Director's ruling on this record.

### 1. Duration of Layoff

If the Company had a policy of recalling employees in reverse order from the order in which they were laid off, then there might be some basis for the assumption that the most recently laid-off employees had the highest expectation of recall. The Company, however, had no such policy. In fact, the Company had no policy of recalling laid-off employees at all.

The Company's foundry superintendent, Michael McFerren, testified at the hearing that the Company maintains a list of employees it has laid off. According to McFerren, an employee's name remains on the list for a period of time equal to his seniority prior to layoff with a maximum of two years. When a vacancy occurs, the Company reviews the list and seriously considers for recall any employees who may have the skill and ability to do the job. Nothing more than "serious consideration" is required. The list is one, but not the only, consideration in filling vacancies; it is merely a "guideline list ... to consider people." After reviewing the list, the Company, at its discretion, may recall an employee on the list, hire a former employee who no longer appears on the list, or hire someone off the street. Should the Company elect to recall from the list, it may select any employee without regard to the employee's layoff date or seniority. The Company has, several times, decided to hire from the outside rather than from the list

to fill vacancies. This testimony was undisputed.

There is no evidence that the Company recalled the most recently laid-off employees in preference to those laid-off less recently, or indeed even to applicants off the street. The fact that a laid-off employee retains seniority does not determine his eligibility to vote. The test is whether the employee has a reasonable expectation of recall. *The Marley Co.*, 131 N.L.R.B. at 869. The length of time the ten employees had been laid off thus gave no support to the Regional Director's finding that they had a reasonable expectation of recall.

### 2. Fluctuations in Business

The Regional Director found that ten of the thirty-four laid-off employees were laid off in response to "routine slight fluctuations" in business rather than long-term changes in production levels. This finding lends no support to the Director's conclusion that these ten employees had a reasonable expectation of recall. As demonstrated above, the Company had no policy of recalling laid-off employees. Although it may be reasonable to assume that the employees laid off in response to significant downturns in the Company's business in November and December of 1985 and January of 1986 had little chance of recall because of the new, lower levels of production, this assumption does not imply that the more recently laid-off employees were any more likely to be recalled. In the absence of a policy of recalling any laid-off workers at all, the degree of fluctuation from normal production levels is not relevant to the determination of whether employees had a reasonable expectation of recall.

### 3. Recall of Employees

The Regional Director found that the Company had been able to recall employees to work a month before the hearing. The record establishes that one employee had been recalled within the month prior to the hearing. Other employees were recalled in the course of 1985 and 1986, but McFerren

could not remember how many employees had been recalled, or when the recalls occurred. It is thus uncertain whether these recalled employees were among those most recently laid off, or taken from the complete list of laid-off employees, or laid-off employees who no longer appeared on the list at all. Moreover, McFerren also testified that the Company has sometimes hired people off the street rather than recalling laid-off employees from the recall list. The fact that an indeterminate number of employees had been recalled over the previous two years provides no basis for the conclusion that ten of thirty-four laid-off employees enjoyed a reasonable expectation of recall.

We note additionally that the Union's argument that "the Company did follow a policy of filling all vacancies from its recall list if there were employees on that list who had the skills and ability to do the available jobs" not only misstates the record, but is also an improper *post hoc* rationale for the Regional Director's decision. *NLRB v. Indianapolis Mack Sales & Serv., Inc.*, 802 F.2d 280, 285 (7th Cir. 1986). The Director in his opinion did not find that the Company had a policy of filling all vacancies from the recall list. The Director stated only that the Company would give the laid-off employees on the list serious consideration for recall, a statement supported by McFerren's testimony, but not dispositive of the question of whether ten laid-off employees had a reasonable expectation of recall.

### 4. The Company's Past Experience

The Company's past experience is among the four criteria the Board generally considers in determining whether laid-off employees have a reasonable expectation of recall.

During the two years immediately preceding the hearing, 1985 and 1986, the Company had experienced a decline in workforce. In January of 1985, the Company had employed 148 hourly employees at its South Beloit foundry. By December of 1986, the figure was down to 98. This decline had been particularly rapid in the period of November, 1985 through January, 1986, when the total number of hourly employees fell from 146 to 80. The number increased to 102 in March, 1986, and remained fairly steady thereafter, with a total of 98 in December, 1986.

McFerren testified that a reason for the general downturn was price competition in the casting-foundry industry. He did not expect any major changes in the industry to occur in the foreseeable future. McFerren also testified that the higher employment levels in 1984 were because of a backlog in orders that resulted when the Company moved casting production to South Beloit and because of an increase in orders for the Company's paper machinery division, an increase that has since fallen off.

In light of the obvious decline in employment levels between January, 1985 and December, 1986, it is difficult to understand how the Regional Director reached the conclusion that sales and production levels remained constant throughout 1985 and 1986. McFerren actually seems to have testified that the levels were generally constant during 1985 and constant, although apparently at a lower level, during 1986.

Based on the record, the Company's recent past experience does not support a finding that ten employees (or any employees) have a reasonable expectation of recall in the foreseeable future.

### 5. The Company's Future Plans

McFerren testified that the Company had no plans regarding any changes in the level of employment at the South Beloit foundry. These employment prognostications are based on the expectation that the Company's orders will not increase, because of the unabated price competition in the casting-foundry industry. This testimony was unrebutted.

In light of the Company's unrebutted evidence as to its future plans, laid-off employees have no reasonable expectation of being recalled in the foreseeable future.

### 6. The Circumstances Surrounding the Layoff

McFerren testified that the employees were laid off because of a lack of work. He also testified that the Company does not foresee any increase in orders, and thus no increase in the level of employment. This testimony supports the conclusion that the laid-off employees have no reasonable expectation of recall.

### 7. What the Employees were told Regarding the Likelihood of Recall

According to McFerren, who generally was the person to inform employees that they had been laid off, the employees would be told they were laid off because of a lack of work. He told them nothing about whether the layoff would be temporary or permanent. He did tell them about the Company's recall list, and that the Company would seriously consider them for openings that might later occur, although he made no representations as to whether he thought there would actually be any openings. He did not make any recommendations as to whether they should look for other work.

The Union believes that these statements, specifically, that the laid-off employees would be considered for any future openings, and McFerren's failure to recommend to the laid-off employees that they look for other work, created for the employees a reasonable expectation of recall, citing *Windsor Woodworking, Inc. v. NLRB*, 647 F.2d 859, 862 (8th Cir.1981). *Windsor* is distinguishable, however. In that case all but one of the employees laid off a year earlier had been recalled to work, the company's business was seasonal in nature and the employees were laid off at the start of the slow season, *and* the employer did not tell the employees that they would not be recalled. Here, by contrast, there is no clear evidence as to how many of the laid-off employees were ever recalled, or how many were passed over for outsiders, and the work is not seasonal. The Eighth Circuit in *Windsor* expressly relied on all three of the above-mentioned factors in finding that, although the evi-

dence was not conclusive, it "permitted the inference that the employees had a reasonable expectation of returning to work." *Id.* We do not believe that the presence of only one of these factors, and the least conclusive one at that, compels, or even reasonably permits the same inference. Therefore, we find that the Company's statements to its laid-off employees did not create in them a reasonable expectation of recall.

After reviewing the Regional Director's stated grounds for his finding that ten of the thirty-four laid-off employees had a reasonable expectation of recall, and after our own consideration of the four more commonly relied-upon grounds for such a finding, we find that the Regional Director's conclusion is not supported by substantial evidence.

## III. CONCLUSION

Because we find that the Regional Director's decision that ten of the thirty-four laid-off employees were eligible to vote in the representation election was incorrect because those employees did not have a reasonable expectation of recall in the foreseeable future, we also find that the Union was improperly certified after the election in which the Union won by a vote of only fifty-two to fifty. Because we have found that the Union was not properly certified, we DENY ENFORCEMENT of the Board's decision that the Company was in violation of sections 8(a)(1) and (5) of the Act.

CUDAHY, Circuit Judge, dissenting:

In this matter involving a representation election, the Board has wide discretion to establish the "safeguards necessary to ensure the fair and free choice of bargaining representation by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946); *accord NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 767, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969); *see also NLRB v. Tom Wood Datsun, Inc.*, 767 F.2d 350, 352 (7th Cir. 1985) ("It is well settled that direct judicial review of a Board decision to certify a collective bargaining representative on the

basis of an election is extremely limited."). Thus, this court "will defer to the Board's selection of rules and policies to govern a particular election so long as those rules are reasonable." *NLRB v. Browning-Ferris Indus. of Louisville,* 803 F.2d 345, 347 (7th Cir.1986); *NLRB v. Affiliated Midwest Hosp., Inc.,* 789 F.2d 524, 527 (7th Cir.1986). Despite the Board's expansive discretion in matters such as the one before us, the majority, relying on a painfully crabbed analysis, has succeeded in nullifying an election now nearly two years old. Not only was the procedure applied by the Regional Director and affirmed by the Board entirely reasonable and supported by substantial evidence, it seems to me to follow practice widely observed throughout industry and in fact obvious. Most important, if the Board's approach is not followed, there is no substitute methodology by which laid-off workers may secure representation. The choices therefore are either to support the Board or to deny all representation to those who have a legitimate concern about working conditions in jobs to which they are likely to return.

The Company, of course, has contended throughout that *none* of the 34 laid-off foundry employees on its recall list had a reasonable expectation of recall. The Union wanted all 34 to vote. The Regional Director took a commendably middle-ground position holding that only 10 workers—those laid off after January 1986—had such a reasonable expectation and were eligible to vote. Obviously this is an attempt at rough justice. There can be no guarantee how many workers will be recalled or exactly who those workers will be. But all that the law requires is a "reasonable expectation" and this standard has been met in full by the Board here. The Board has essentially followed the simple rule of "last fired, first hired." If this employer had a union contract, it would presumably have to abide by that rule, which is, of course, broadly observed throughout industry. Since it has no such contract, it can claim that there is simply no way of telling who might be recalled— and thereby purge from the rolls potential voters who it apparently believes may be sympathetic to the Union.

The Company has an unwritten policy concerning recall from layoff. Pursuant to that policy, the Company maintains a "recall list" identifying the "recall seniority" of laid-off employees. Employees remain on the list for a period of time equal to their layoff up to a maximum of two years. As long as the employee is on the list, he remains on the Company's payroll records. For one or two months after layoff, the Company maintains insurance coverage; thereafter, laid-off employees can retain coverage under optional plans. It has been the Company's practice to use the list to recall people. Although the Company is not restricted to recalling employees from the list, Michael McFerren, the superintendent of the foundry, testified that the recall list is a "serious consideration" in deciding which employees to recall. McFerren in fact told the laid-off workers in this case that the Company would give them "serious consideration for coming back, depending on their ability to do the job and their skills." McFerren did not tell them they were permanently laid off or recommend that they seek other employment.

The Regional Director found that the ten employees laid off after January 1986 were in a "different position" from those laid off during the workforce reduction completed in January 1986. This finding is amply supported by record evidence. The layoff of 24 employees between November 1985 and January 1986 reflected a relatively long-term readjustment in the workforce level. It was therefore reasonable for these employees to view the probability of their recall as slight. On the other hand, the employees laid off after January 1986 were laid off sporadically in reaction to what the Regional Director characterized as "routine slight fluctuations in the [Company's] business." In that context, McFerren's statements to these employees that they would receive "serious consideration" for recall to future vacancies and his failure to tell them that they were being laid off permanently or that they should seek other employment created for them a rea-

sonable expectation of reemployment in the future.

There is no merit to the Company's argument that the relative shortness of the period of the layoff had "no bearing" on legitimate recall expectations. Not only is it reasonable to assume that any employer would tend to prefer recent experience in selecting a qualified job candidate; but it is also persuasive that the employees at issue had survived the culling out process attendant to the major workforce reduction that took place between November 1985 and January 1986. Because these employees had retained their jobs when others were laid off, they could reasonably assume they would be preferred for recall over those others when jobs became available through normal turnover or through an upturn in business.[1] For these reasons, I think the findings of the Regional Director on the recall issue are amply supported. The other objections of the Company are without merit. I therefore respectfully dissent.

1. The Company in its brief paints a bleak picture of its prospects, thus supporting its arguments for not anticipating recalls from layoff. I am under the impression that, in the months since this election was held in January 1987, the manufacturing business in the country has increased vigorously, if not dramatically, due to an export boom. It would be interesting to know what this has meant in terms of employee recalls by the Beloit Corporation. According to the New York Times, "The nation's factories, mines and utilities operated at 83.5 percent of capacity in July [1988], the highest operating level in eight years." N.Y. Times, Aug. 17, 1988, at 35, col. 4 (National Edition).